SMITH, *Secretary of State, et al. v.* STATE *ex rel.* HEPBURN.

No. 1931. Opinion Filed November 15, 1910.

Rehearing Denied February 9, 1911.

(113 Pac. 932.)

1. **STATES—Seat of Government—Enabling Act—Effect.** Oklahoma Enabling Act (Act June 16, 1906, c. 3335, sec. 2, 34 Stat. 268) in part provides: "The capital of said state shall temporar'ly be at the city of Guthrie, in the present territory of Oklahoma. and shall not be changed therefrom previous to **Anno Domini** nineteen hundred and thirteen." The terms and condit'ons of said act were adopted by ordinance irrevocable by the delegates elected pursuant thereto in Constitutional Convention assembled. Held, in a suit to restrain state officers from, in effect, removing the capital from Guthrie prior to that time pursuant to the provisions of an initiated bill proclaimed by the Governor to have been adopted by the electors of the state at the polls, that said provision so adopted had the force and effect of law, and is binding on the state unless repealed by said initiated bill.

2. **STATES—Admission into Union—Powers—Effect of Limitations in Enabling Act.** Since Congress has no power to admit a state into the Union except on an equal footing with the original states, in accordance with the rights, powers, and duties defined by the Constitution, the admission of Oklahoma fixed her status and that of her people as that acquired by the other states of the federal Union under the Constitution, anything in the Enabling Act (Act June 16, 1906, c. 3335, sec. 2, 34 Stat. 268) to the contrary notwithstanding; and conferred on such state the exclusive power to enact and repeal its own laws, provided the same enacted be not repugnant to the Constitution of the state or of the United States.

3. **STATUTES—Initiated Bill—Adoption by People—Sufficiency of Submission.** Where, in a suit to restrain certain state officers from removing any property pertaining to their several offices from the city of Guthrie, and from doing any official act at any other place, on the ground that the initiated bill under which they were attempting to act had never been adopted by the people at the polls, it seemed to be within the contemplation of said bill, which in effect provided: (1) For the permanent location of the capital of the state by election; (2) makes the place receiving a majority of the votes cast at that or a final election the permanent capital of the state; (3) declares three certain cities candidates for the permanent location of said capital and provides the form of ballot; (4) authorizes any other c'ty, town, or place to become a candidate upon petition, etc.; (5) prescribes the procedure for a second election in the event no candidate receives

a majority of the votes cast at the first election; (6) creates a State Capital Commission to be appointed by the Governor; (7) prescribes their tenure of office, salaries. etc.; (8) makes said commission a body corporate with powers to sue and be sued; (9) empowers said commission to purchase land for the capital site and locate the state buildings; (10) authorizes the commission to exercise the power of eminent domain; (11) empowers said commission to select land belonging to the state for capital purposes and to cause the same to be appraised and paid for by the state; (12) authorizes said commission to plat and sell the lands thus acquired and create a building fund; (13) empowers said commission to employ engineers, architects, and clerical help at the expense of the state and fix their compensation; (14) empowers said commission to enter into a contract for the construction of a capitol building, subject to the approval of the Legislature; (15) makes an appropriation of $600,000 for the use of said commission, to submit to the electors of the state for their adoption or rejection at the polls three questions, to-wit, "Shall it (the bill) be adopted?" "Shall the capital be located?" and "Shall the capital of the state of Oklahoma be permanently locate at (one of three certain cities, naming them)? and that said question, "Shall it be adopted?" prescribed by the act of April 16, 1908 (Laws 1907-08, c. 44) sec. 10, was omitted from the ballot. *Held,* that said bill was not adopted and hence failed to become a law. *Held,* further, that an affirmative vote upon the qustion submitted. "Shall the capital be located?" did not include an affirmative vote upon the implied question not submitted, "Shall it be adopted?" *Held,* also, that as said officers were attempting to act without authority of law, which, if permitted, would involve an unlawful expenditure of the moneys of the state, it was not error for the trial court to grant the temporary injunction complained of.

(Syllabus by the Court.)

*Error from District Court, Logan County; A. H. Huston, Judge.*

Action by the State of Oklahoma on the relation of James Hepburn, County Attorney, against Thomas P. Smith, Secretary of State, and other state officers. From an order granting a temporary injunction, defendants bring error. Affirmed.

Chas. West, Atty. Gen., *Stuart, Gordon & Liedtke,* and *Burwell, Crockett & Johnson,* for plaintiffs in error.

James Hepburn, County Atty., *Burford & Burford, Dale, Bierer & Hegler,* and *C. G. Hornor,* for defendant in error.

TURNER, J. From an order granting a temporary injunction rendered and entered in the district court of Logan county

restraining Thomas P. Smith, Secretary of State, and 14 other state officers from removing any of the property pertaining to their several offices from the city of Guthrie, and from doing any official act at any other place, pursuant to the prayer of a petition filed in said court in the name of the state of Oklahoma, on the relation of James Hepburn, county attorney of said county, alleging, in substance, that the pretended authority under which defendants were about to act, being State Question No. 15, Initiative Petition No. 7, purporting to submit to a vote of the people the selection of a place for the permanent location of the capital of the state, duly filed with the Secretary of State, voted on by the people at an election held June 11, 1910, and by proclamation of the Governor declared lawfully adopted, enacted, and approved by the people, and Oklahoma City at said election to have been duly and lawfully selected as the place for the permanent location of the capital of the state by the people thereof, was never in fact, and for certain reasons stated, properly submitted to a vote of the people, and never by them adopted, and for that reason never became a law, and, if properly submitted and adopted, the same is in conflict with that part of the act of June 16, 1906, known as the "Enabling Act" (Act June 16, 1906, c. 3335, § 2, 34 Stat. 268), which provides, in effect, that the capital of the state shall temporarily be at the city of Guthrie, and shall not be changed therefrom prior to the year 1913, which was by the Constitutional Convention adopted by ordinance irrevocable, and for that reason said measure is unconstitutional and void, and that said removal will involve an unlawful expenditure of $10,-000 of the moneys of the state; plaintiffs in error, defendants below, bring the case here, and assign for error the granting of said order. The right of the trial court to entertain jurisdiction of this suit having been recently decided in its favor as to all the defendants save the Governor in *State ex rel. Attorney General v. Huston, District Judge, et al.* (an original application for a

writ of prohibition), 27 Okla. 606, 113 Pac. 190, we pass to the merits of this case.

In granting the order complained of the trial court held that the initiated bill, if legally adopted, in that it purported to change the location of the capital of the state and permanently locate the same prior to the year 1913, was in conflict with that part of the Enabling Act, which provides: "The capital of said state shall temporarily be at the city of Guthrie, in the present territory of Oklahoma, and shall not be changed therefrom previous to *Anno Domini* nineteen hundred and thirteen, but said capital shall, after said year, be located by the electors of said state at an election to be provided for by the Legislature"; and as said act was adopted by the Constitutional Convention by ordinance irrevocable, the same thereby became a contract or compact between the sovereignties state and federal, and that the bill must fall as in violation of said compact. On the other hand, it is contended that the Enabling Act was an act defining the metes and bounds of the grant of power to the delegates in Constitutional Convention assembled, and suggestions or instructions to them as to what the Constitution should contain, no part of which remained in force after the erection of the state, except such as was by it adopted after its admission as a state, and, as the provision of the Enabling Act to the effect that the capital shall temporarily be at Guthrie and shall not be changed therefrom previous to 1913 was never so adopted, it has no binding effect on the state.

In support of their contention defendants rely on *Permoli v. Municipality No. 1 of the City of New Orleans*, 3 How. 589, 11 L. Ed. 739, and kindred cases. In that case plaintiff in error was fined $50 for the violation of a city ordinance making it an offense to expose a corpse in any of the Catholic churches of the municipality under penalty of that amount. The cause was brought up by writ to the city court of that municipality. The court, in determining whether said ordinance was in conflict with

the Constitution or laws of the United States, in order to determine its jurisdiction, said:

"The principal stress of the argument for the plaintiff in error proceeded on the ordinance of 1787. The act of 1805 (chapter 83) having provided that from and after the establishment of the government of the Orleans Territory the inhabitants of the same should be entitled to enjoy all the rights, privileges, and advantages secured by said ordinance and then enjoyed by the people of the Mississippi Territory. It was also made the frame of government, with modifications. In the ordinance, there were terms of compact declared to be thereby established between the original states and the people of the state afterwards to be formed northwest of the Ohio, unalterable, unless by common consent— one of which stipulations is that 'no person demeaning himself in a peaceable manner shall ever be molested on account of his mode of worship, or religious sentiments, in the said territory.' For this provision is claimed the sanction of an unalterable law of Congress, and it is insisted the city ordinance above has violated it; and what the force of the ordinance is north of the Ohio we do not pretend to say, as it is unnecessary for the purposes of this case. But as regards the state of Louisiana, it had no further force, after the adoption of the state Constitution than other acts of Congress organizing, in part, the territorial government of Orleans, and standing in connection with the ordinance of 1787. So far as they conferred political rights, and secured civil and religious liberties (which are political rights), the laws of Congress were all superseded by the state Constitution; nor is any part of them in force, unless they were adopted by the Constitution of Louisiana as laws of the state, * * * It follows no repugnance could arise between the ordinance of 1787 and an act of the Legislature of Louisiana, or a city regulation founded on such act * * *"

—and dismissed the case for want of jurisdiction.

See, also, *Escanaba, etc., Co. v. City of Chicago,* 107 U. S. 678-691, 2 Sup. Ct. 185, 27 L. Ed. 442; *Pollard's Lessee v. Hagan,* 3 How. 212, 11 L. Ed. 565; *Bolln v. Nebraska,* 176 U. S. 83, 20 Sup. Ct. 287, 44 L. Ed. 382; *Ward v. Race Horse,* 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244. But these cases do not decide the force and effect on the state of an act accepted by

ordinance irrevocable by delegates in Constitutional Convention assembled, and hence the rule there laid down has no immediate application here. When Congress by virtue of the Enabling Act tendered to those delegates thus assembled the grant of power therein contained authorizing them under certain conditions precedent to form a state government and instructing them as to what their Constitution should contain, it was for the Convention to accept and comply or reject and disperse. Of this grant of power the court in *Frantz et al. v. Autry,* 18 Okla. 561, 91 Pac. 193, said:

"It is true that Congress has the power to impose conditions upon a territory, as a condition precedent to entitle it to admission as a state. Accordingly, Congress placed certain restrictions and limitations upon the Convention, which it was required to incorporate into the Constitution, and to be ratified by the people. These limitations and restrictions, when ratified by the people, become a part of the fundamental law of the state. When, therefore, Congress authorized the people of Oklahoma and Indian Territory to form a Constitution and state government and be admitted into the Union on an equal footing with the original states, it meant that it should be admitted on equal terms with the original states. Hence the Enabling Act was not a limited or restricted grant, but it was an absolute grant, subject to the Constitution of the United States, and the limitations and restrictions imposed in the Enabling Act as a condition precedent to such admission."

One of those conditions was:

"Sec. 22. That the Constitutional Convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act."

Accordingly in accepting said grant of power the Convention adopted this ordinance:

"Be it ordained by the Constitutional Convention for the proposed state of Oklahoma, that said Constitutional Convention do, by this ordinance irrevocable, accept the terms and conditions of an act of Congress of the United States, entitled 'An act to enable the people of Oklahoma and the Indian Territory to form a Constitution and state government and be admitted into the Union on

an equal footing·with the original states; and to enable the people of New Mexico and of Arizona to form a Constitution and state government and be admitted into the Union on an equal footing with the original states,' approved June the sixteenth, *Anno Domini,* nineteen hundred and six."

In thus accepting, the Convention was speaking for the whole people of the proposed state, and was exercising legislative or lawmaking power of the highest order. 1 Bryce's American Com. 436, says:

"A state Constitution is really nothing but a law made directly by the people voting at the polls upon a draft submitted to them. The people of a state when they so vote act as a primary and constituent assembly, just as if they were all summoned to meet in one place like the folkmotes of our Teutonic forefathers, it is only their numbers that prevent them from so meeting in one place, and oblige the vote to be taken in a variety of polling places. Hence the enactment of a Constitution is an exercise of direct popular sovereignty to which we find few parallels in modern Europe, though it was familiar enough to the republics of antiquity, and has lasted until now in some of the cantons of Switzerland."

Or, as stated in *Goodrich v. Moore,* 2 Minn. 61 (Gil. 49), 72 Am. Dec. 74, where speaking of the Convention the court said:

"It is the highest legislative assembly recognized in law, invested with the right of enacting or framing the supreme law of the state."

Or, as stated in Proceedings of New York Con. Con. 1894, pp. 79, 80:

"A Constitutional Convention is a legislative body of the highest order. It proceeds by legislative methods. Its acts are legislative acts. Its functions are not to execute or interpret laws, but to make them. That the consent of the general body of electors may be necessary to give effect to the ordinances of the Convention no more changes their legislative character than the requirement of the Governor's consent changes the nature of the action of the Senate and Assembly."

The result of this ordinance irrevocable adopted by said Convention, which to make irrevocable did not require the consent of the body of the electors, was to enact a law, binding upon the peo-

ple of the state when admitted into the Union, in terms that "The capital of the state shall temporarily be at the city of Guthrie, in the territory of Oklahoma, and shall not be changed therefrom previous to *Anno Domini* nineteen hundred and thirteen."

That such was the effect of an ordinance irrevocable adopted was held in *Benner et al. v. Porter,* 9 How. 235, 13 L. Ed. 119. In that case the people of the Territory of Florida claiming a right to admission into the Union met in convention and adopted their Constitution, without referring the same to the vote of the general body of electors, January 11, 1839; but it was not acted upon by Congress until March 3, 1845. It was then accepted and said territory admitted. No conditions were imposed except that she should not interfere with the disposal of the public lands nor levy any tax on same while they remained the property of the United States. In order to avoid inconvenience or delay in the organization of the government, the Convention adopted an ordinance in part:

"That all laws and parts of laws now (then) in force or which may hereafter be passed by the Governor and Legislative Council of the Territory of Florida not repugnant to the provisions of this Constitution, shall continue in force until by operation of their provision or limitation the same shall cease to be in force, or until the General Assembly of this state shall alter or repeal the same."

The court said:

"It will be seen, therefore, under this ordinance of the Convention, that, on the admission of Florida as a state into the Union, the organization of the government under the new Constitution became complete; as every department became filled at once by the adoption of the territorial laws and appointments of the territorial functionaries for the time being. The Convention being the fountain of all political power, from which flowed that which was embodied in the organic law, were, of course, competent to prescribe the laws and appoint the officers under the Constitution, by means whereof the government could be put into immediate operation, and thus avoid an interregnum that must have intervened, if left to an organization according to the provisions of that instrument. This was accomplished by a few lines, adopting the machinery of the territorial government for

the time being, and until superseded by the agency and authority of the Constitution itself."

From which we learn that by an ordinance adopted by the delegates in Constitutional Convention assembled, the laws of the territory of Florida then in force and thereafter enacted, if any, were continued in force throughout the state, after its admission into the Union, and, of course, until they expired by their own limitation or were repealed, were binding upon the people of the state.

To the same effect is *Frantz v. Autry, supra.* The court, speaking of the limitations of the Convention, in the syllabus said:

"The Convention has, and can exercise plenary powers, subject to the limitations and restrictions that the Constitution shall be republican in form, that it shall not be repugnant to the Consitution of the United States and the principles of the Declaration of Independence, that no distinction shall be made on account of race or color, and that the Convention shall by ordinance irrevocable accept all the terms and conditions in the Enabling Act."

And in defining an ordinance:

"An ordinance, as used in this act, means a law which is essential to carrying into effect merely the objects for which the Convention was created. Such an ordinance, when once adopted by the Convention, has the force and effect of law."

In that case, pursuant to authority conferred in the Enabling Act, the Constitutional Convention passed an ordinance to submit the Constitution to the people for their adoption or rejection at an election at a time fixed therein. And since the decision in that case has placed beyond doubt the power of said Convention so to do and legislate therein, which it did, among other things (section 8), "That the election laws of the territory of Oklahoma now in force, as far as applicable and not in conflict with the Enabling Act, including the penal laws of said territory relating to election and illegal voting, are hereby extended and put in force throughout the proposed state of Oklahoma until the Legislature of said proposed state shall otherwise provide;   *   *   *"   so we entertain no doubt of the power of said Convention to adopt by ordinance,

which it did, that part of the Enabling Act in controversy and make it a law binding on the state as fully as if set forth in *haec verba* in said ordinance. In that case the court said:

"It will thus be seen that Congress conferred direct and express power and authority upon the Convention to pass an appropriate ordinance to submit the Constitution to the people for its ratification or rejection, at an election at a time fixed in said ordinance, by the Convention. Such an ordinance, when once adopted by the Convention, has the force and effect of statute law."

See Jamison on Constitutional Conventions (4th Ed.) p. 98, c. 103.

Hence we conclude that said Convention, by thus adopting the terms and conditions of the Enabling Act, placed upon the statute books of this state that part of said act insisted on, and that the same is still in force as law, unless repealed by the initiated bill. It will not do to say that by thus adopting said provision, "the capital of the state shall temporarily be at the city of Guthrie * * * and shall not be changed therefrom prior to 1913," the right to change it prior thereto by act of the Legislature was taken away from the state; for the reason that by the act of admission Congress was charged with knowledge that the Enabling Act had been complied with, and by section 1 of the Bill of Rights which reads, "All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good many require it: Provided, such change be not repugnant to the Constitution of the United States;" that the people of the state expressly reserved the right to repeal said law whenever the public good required it, and for the further reason that upon the admission of the state it became possessed of all the rights of dominion and sovereignty which belonged to the original states and stands upon an equal footing with them in all respects whatever. If Congress intended, by requiring that said provision be adopted by ordinance irrevocable, to fasten upon this state an irrepealable law, Congress exceeded its powers. The idea that this state is

admitted into the Union thus debarred, while another state is admitted with the privilege of repealing its laws to conform to the wishes of its people, is so repugnant to equality under the Constitution that we cannot believe Congress intended it. But if it did, and by said act and ordinance irrevocable an attempt was made to fasten upon the state a law irrepealable before 1913, such an attempt is ineffectual.

*Edwards v. Lesueur,* 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815, was a suit by plaintiff as a property owner of Jefferson City to restrain the Secretary of State from submitting to a vote of the electors of the state a proposal passed by the General Assembly for amending the Constitution so as to provide therein for the removal of the seat of government from the city of Jefferson to the city of Sedalia. The petition charged that by the act of Congress admitting the state into the Union, the action of the Convention called pursuant thereto and subsequent legislation of the state in conformity therewith, the seat of government was established at Jefferson City, and could not be removed therefrom without the consent of the United States. The control of the United States over the location of the capital was based on section 6 of the Enabling Act, providing, in effect, that certain propositions were thereby offered to the Convention of the territory of Missouri when formed "for their free acceptance or rejection, which, if accepted by the Convention, shall be obligatory upon the United States."

The fourth proposition granted four sections of land to the state "for the purpose of fixing their seat of government thereon." All the propositions were upon the condition that the Convention should provide "by an ordinance irrevocable without the consent of the United States, that every and each tract of land sold by the United States from and after the 1st day of January next shall remain exempt from any tax laid by order or under authority of the state." The Convention accepted the terms of admission and declared "that this ordinance shall be irrevocable without the consent of the United States." Pursuant to the Constitution then

adopted the Legislature appointed commissioners who selected land upon which Jefferson City was located, lots were sold by the state, and the seat of government located there. Among the contentions urged was that the state had thus become irrevocably bound to maintain its seat of government at said city unless by the consent of the United States. The court held not so and said:

"But neither the Convention nor the Legislature had power in this respect to irrevocably bind the people of the state. The right of the people to establish and remove their seat of government at pleasure involves a governmental subject about which there can be no irrepealable law"

—and reversed the judgment of the trial court granting the writ.

If it did, then can be said of the United States in this case as was said by the court in *Armstrong et al. v. Board of Co. Com. of Dearborn Co.,* 4 Blackf. (Ind.) 208, where substantially the same contention was made by appellants who claimed a vested right in the location of a county seat by virtue of certain legislation forever locating it at a certain point:

"If the claim be available, it clothes the appellants with the power of controlling the general policy of the state, the rights of the people of that county, and the administration of justice in it. The state itself is stripped of one of the inherent and essential attributes of sovereignty"

—the power to exercise which, the court held to be a power incident to sovereignty and secured by the Constitution. But assuming that by adopting by ordinance irrevocable that part of the Enabling Act fixing the capital at Guthrie until 1913, the same became and is a part of the compact or contract admitting the state into the Union, and was imposed upon the state by Congress as a condition precedent to its admission, as is contended, is that compact, as such, binding on the state to the extent that the state is without power to change it? We think not, for the reason that the state had no power to thus surrender, nor the federal government power to accept a surrender of the municipal right of sovereignty thus attempted to be surrendered as a condition pre-

cedent to admission into the Union, and hence such surrender would be void. Void for the reason that as the United States government is one of delegated powers, and as nowhere has the Constitution vested in Congress power to wrest from the people of a proposed state a surrender of a portion of their powers purely political involving no property right, as a condition precedent to their admission as a state, it is safe to say that no such power exists and not existing cannot be enforced. The right to remove the capital of a state pursuant to an act of the lawmaking power of the state is a political right, and its exercise the exercise of political or governmental power, and a municipal right of sovereignty which the state is powerless to barter away, by compact or otherwise.

Tucker on the Constitution, p. 614, says:

"The states have confided to the Congress as their agent the admission of a state into the Union under the Constitution. Can this constitutional authority of Congress be construed as to invest Congress as an agent with powers to impose conditions upon the new members which the Constitution has not prescribed? And, if so, does the new state enter the Union shorn of its power *pro tanto* by the agent authorized to open its doors to the new commonwealth without any such condition? The better opinion would clearly be that Congress could not impose as an obligation upon a state at the time of its admission into the Union such a restriction as it had no original power to enact or enforce."

In *Pollard's Lessees v. Hagan*, 3 How. 221, 11 L. Ed. 565, the court said:

"When Alabama was admitted into the Union on an equal footing with the original states, she succeeded to all the rights of sovereign jurisdiction and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States for the temporary purposes provided for in the deed of cession, and the legislative acts connected with it. Nothing remained to the United States, according to the terms in the agreement, but the public lands, and if an express stipulation had been inserted in the agreement, granting the municipal right of sovereignty and eminent domain to the

United States, such stipulation would have been void and inoperative, because the United states have no constitutional capacity to exercise municipal jurisdiction, sovereignty or eminent domain, within the limits of a state, or elsewhere, except in the cases where it is expressly granted."

In *United States ex rel. Friedman et al. v. United States Express Co.* (D. C.) 180 Fed. 1006, the court said:

"It must therefore be conceded that, when Oklahoma was admitted under the federal Constitution into the Union as a state, the act of admission gave to her all the powers, and devolved upon her all the duties which belong to the other states under the Constitution, anything in the Enabling Act to the contrary notwithstanding. She could come into the Union in no other way. By virtue of the Constitution her admission fixed her status, and that of her people, to the people of other states, to the other states themselves, and to the federal government. Congress cannot exact of a state—even a state coming into the Union—the surrender or waiver of any of the constitutionally inherent powers of sovereignty under the Constitution or such as belong to the original states; nor can a state either surrender or stipulate away any of its sovereignty or render herself less sovereign than the other states. Bearing these principles in mind, Congress knew that the moment Oklahoma was admitted into the Union as a state that the laws regulating interstate commerce must apply to Oklahoma as to all the other states; it knew that the power over intrastate commerce would inure to the state of Oklahoma by the act of admission; it knew that Oklahoma must enact its own laws regulating intrastate commerce, for the simple reason that the power to enact such laws had not been granted to Congress; it knew that the great body of laws traceable to the police power of the state must be enacted by the state for the same reason."

*Stone v. State of Mississippi,* 101 U. S. 814-821, 25 L. Ed. 1079, was error to the Supreme Court of Mississippi. The suit was originally commenced by information filed in the circuit court of Warren county by the Attorney General of Mississippi in behalf of the state against the plaintiffs in error, defendants below, requiring them to show by what warrant or authority they exercised the franchise of running a lottery in the state. Defendants pointed to a certain act of the Legislature of Mississippi which they claimed

conceded them the franchise of issuing and vending lottery tickets. They admitted that by a certain section of the Constitution of the state it was provided that such should not be authorized by the Legislature and that by subsequent act of the Legislature it was made unlawful to conduct a lottery in the state. They insisted that they had complied with the terms of the charter for conducting their business in accordance therewith, and that the Constitution and act of the Legislature aforesaid interfered with their vested rights in violation of the Constitution of the United States in attempting to impair the obligation of a contract. The court in passing, among other things, held the power of government to be a trust committed by the people to the government, no part of which can be granted away; that lotteries were *mala prohibita;* that the power to stop them was governmental; and that all one could get by such a charter was a suspension of certain governmental rights in his favor, subject to withdrawal at the will of the people. The court said:

" 'That the framers of the Constitution did not intend to restrain states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed.' The present case, we think, comes within this limitation. We have held, not, however, without strong opposition at times, that this clause protected a corporation in its charter exemptions from taxation. While taxation is, in general, necessary for the support of government, it is not part of the government itself. Government was not organized for the purpose of taxation, but taxation may be necessary for the purposes of government. As such, taxation becomes an incident to the exercise of the legitimate functions of government, but nothing more. No government, dependent on taxation for support, can bargain away its whole power of taxation, for that would be substantially abdication. All that has been determined thus far is, that for a consideration it may, in the exercise of a reasonable discretion, and for the public good, surrender a part of its powers in this particular. But the power of governing is a trust committed by the people to the government, no part of which can be granted away" —and affirmed the judgment of ouster.

The inevitable conclusion to be drawn from this case is that should the state by charter, contract, compact, or otherwise part for a time with any of its governmental powers, or powers purely political, or municipal rights of sovereignty, that inasmuch as the same are held by it in trust for the people of the state, they are not subjects of contract, and may be withdrawn or reclaimed at any time by the people of the state.

*Newton et al. v. Board of Co. Com. Mahoning County,* 26 Ohio St. 618, was a suit by certain citizens and property owners in the town of Canfield to enjoin defendants from removing the county seat from Canfield to Youngstown. The facts were that the Legislature by the act of February 16, 1846, created the county of Mahoning and named therein Canfield as the county seat. The eighth section of the act, in effect, provided that before the same should be permanently established there the citizens thereof were required to give bond to the county commissioners in a certain sum to be applied in erecting public buildings for said county. The citizens of the town were also required to donate a suitable lot on which to erect the same—all of which was done and accepted by the board in full satisfaction of the bond. and the county seat established at said town. On April 9, 1874, the Legislature passed another act providing for the removal of the county seat from Canfield to Youngstown, conditioned upon a majority vote of the electors of said county, and the citizens of Youngstown donating certain lands upon which to erect the public building of the county and have the same erected thereon, etc., all of which was done. In support of the injunction it was contended by the citizens of Canfield that the act of 1846 was in the nature of a contract, and that the law of 1874 impaired its obligation, and was therefore in conflict with the Constitution of the United States, but the court held that no contract existed and said:

"The power to establish and remove county seats is one which cannot be parted with by legislative contracts. It is not the subject of contract. No case or authority is cited by council, and it is presumed none can be shown, sustaining or enforcing any such

contract; while several cases are adduced ([*Armstrong v. Board of Com'rs of Dearborn County*], 4 Blackf. [Ind.] 208; [*Alley v. Denson*], 8 Tex. 297; [*Adams v. Logan County*], 11 Ill. 336; [*Harris v. Shaw*], 13 Ill. 456) to show that it is a contract which there is no legislative power to make."

—and dismissed the petition.

This case went to the Supreme Court of the United States (100 U. S. 548-559, 25 L. Ed. 710), where the court said:

"The police power of the states, and that with respect to municipal corporations, and to many other things that might be named, are of the same absolute character. Cooley, Const. Lim. p. 232; *Regents v. Wilson,* 9 Gill. & J. (Md.) 365 [31 Am. Dec. 72]. In all these cases there can be no contract and no irrepealable law, because they are 'governmental subjects,' and hence within the category before stated."

And, speaking of the reasoning in support of the contention of plaintiffs in error, said:

"The same reasoning pushed a step further in the same direction would involve the same result with respect to the seat of government of a state. If a state capital were sought to be removed, under the circumstances of this case with respect to the county seat, whatever the public exigencies or the force of the public sentiment which demanded it, those interested, as are the plaintiffs in error, might according to their argument, effectually forbid and prevent it; and this result could be brought about by means of a bill in equity and a perpetual injunction. It is true a state cannot be sued without its consent, but this would be a small obstacle in the way of the assertion of so potent a right. Though the state cannot be sued its officers whose acts were illegal and void may be. *Osborn v. Bank,* 9 Wheat. 738, 6 L. Ed. 204; *Davis v. Gray* [16 Wall. 203, 21 L. Ed. 447]. A proposition leading to such a consequence must be unsound. The parent and the offspring are alike. *Armstrong v. Com'rs,* 4 Blackf. [Ind.] 208"

—and affirmed the judgment of the lower court.

But again, supposing that by said ordinance a compact was formed between the two sovereignties fixing the capital at Guthrie until 1913, such compact or contract, inasmuch as it involves no property rights, is not within the protection of that part of the

federal Constitution, providing, in effect, that no state shall pass any law impairing the obligation of contracts, and for that reason the initiated bill, if otherwise valid, is not in conflict therewith and must stand. This was held by the court in the Stone case in answer to the contention of the lottery company that the Constitution and legislative act above referred to interfered with their vested rights and violated the Constitution of the United States in attempting to impair the obligation of the contract contained in their charter. The court said: "The contracts which the Constitution protect are those that relate to property rights, not governmental." This was held by the court to be settled law since the *Dartmouth College Case.*

In *Newton v. Mahoning County, supra,* speaking to this point, the Supreme Court of the United States said:

"Undoubtedly, there are cases in which a state may, as it were, lay aside its sovereignty and contract like an individual, and be bound accordingly. *Curran v. Arkansas,* 15 How. 304 [14 L. Ed. 705]; *Davis v. Gray,* 16 Wall. (83 U. S.) 203, 21 L. Ed. 447. The cases in which such contracts have been sustained and enforced are very numerous. Many of them are cases in which the question was presented whether a private act of incorporation, or one or more of its clauses, is a contract within the meaning of the national Constitution. * * * The *Dartmouth College Case,* 4 Wheat. 518 [4 L. Ed. 629], was the pioneer in this field of our jurisprudence. The principle there laid down, and since maintained in the cases which have followed and been controlled by it, has no application where the statute in question is a public law relating to a public subject within the domain of the general legislative power of the state, and involving the public rights and public welfare of the entire community affected by it. The two classes of cases are separated by a broad line of demarcation. The distinction was forced upon the attention of the court by the argument in the *Dartmouth College Case.* Mr. Chief Justice Marshall said: 'That, anterior to the formation of the Constitution, a course of legislation had prevailed in many, if not all, of the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief by restrain-

ing the power which produced it, the state Legislatures were forbidden 'to pass any law impairing the obligation of contracts'—that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself; and that since the clause in the Constitution, must in construction, receive some limitation, it may be confined, and ought to be confined, to cases of this description; to cases within the mischief it was intended to remedy. The general correctness of these observations cannot be controverted. That the framers of the Constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government and that the instrument they have given us is not to be so construed, may be admitted. The provision of the Constitution never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general rights of the Legislature to legislate on the subject of divorce. * * * If the act of incorporation be a grant of political power; if it create a civil institution to be employed in the administration of the government; or if the funds of the college be public property; or if the state of New Hampshire, as a government, be alone interested in its transaction, the subject is one in which the Legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States.'" (For an able and interesting article covering this entire field of discussion, see November, 1910, issue of Columbia Law Review, p. 1.)

We are therefore of opinion that the initiated bill repealed that part of the enabling act relied on which was by said ordinance adopted and put in force as law throughout this state, and must stand; that is, if submitted according to law to a vote of the people and by the people adopted at the polls.

As prior to the initated bill there was no law providing for the removal or furnishing procedure for holding an election for the submission to the electors of the state the question of the removal and permanent location of the seat of government, for that purpose there was, on July 31, 1909, filed in the office of the Secretary of State Initiative Petition No. 7 addressed by the re-

quisite number of electors of the state to the Governor, in which they ordered that the proposed law thereto attached be submitted to the legal voters of the state for their approval or rejection by a certain time.

Without attempting to construe the bill, speaking generally, it provides: (1) For the permanent location of the capital of the state by election. (2) Makes the place receiving a majority of the votes cast at that or a final election the permanent capital of the state. · (3) Declares three certain cities candidates for the permanent location of said capital and that:

The ballots and ballot title to be used and voted at such elections shall be prepared, certified and printed as provided by the act of the Legislature approved April 16th .1908, entitled,. * * * but shall read in substance as follows: Shall the capital of the state of Oklahoma be permanently located as provided in State Question, Initiative Petition No. ——— (insert here number petition submitting this bill will bear.)

        (   )   Yes.
        (   )   No.

Shall the capital of the state of Oklahoma be permanently located at:

| Oklahoma City | ( | ) | Yes. |
| Shawnee | ( | ) | Yes. |
| Guthrie | ( | ) | Yes. |
| .................. | ( | ) | Yes. |
| .................. | ( | ) | Yes. |

(4) Authorizes any other city, town or place to become a candidate upon petition, etc. (5) Prescribes the procedure for a second election in the event no candidate received a majority of the votes cast at the first election. (6) Creates a State Capital Commission to be appointed by the Governor. (7) Prescribes their tenure of office, salaries, etc. (8) Makes said commission a body corporate with powers to sue and be sued. (9) Empowers said commission to purchase land for the capital site and locate the state buildings. (10) Authorizes the commission to exercise the power of eminent domain. (11) Empowers said commission to select land belonging to the state for capital purpose, and to cause the same to be appraised and paid for by the state. (12) Authorizes said commission to plat and sell the lands thus acquired and

create a building fund.  (13) Empowers said commission to employ engineers, architects, and clerical help at the expense of the state and fix their compensation.  (14) Empowers said commission to enter into a contract for the construction of a capitol building, subject to the approval of the Legislature.  (15) Makes an appropriation of $600,000 for the use of said commission.

In submitting this bill for adoption or rejection by the people at the polls at the election held June 11, 1910, pursuant to the call of the Governor for that purpose, it is clear that, as there was no competing question, and the adoption or rejection of the proposed bill was one of the questions to be submitted at that election, pursuant to the intent of the petition initiating the bill, which reads:  "The questions we herewith submit to our fellow voters are:  Shall the following bill be adopted, and shall the capital of the state be permanently located at one of the cities, towns or places mentioned or described on the ballot and ballot title to be used and voted at such election"; after the ballot title there should have been submitted on the ballot a question in substantial compliance with that prescribed by the act of April 16, 1908, which reads:

                                  ("Yes")   ☐
        Shall it be adopted?
                                  ("No")    ☐

This question, however, was entirely omitted from the ballot, but instead was used the following:

Ballot Title.

Proposes to permanently locate State Capital; create commission of three to be appointed by Governor, January 1st 1911, or sooner; defines powers and duties; appropriates six hundred thousand dollars to purchase not to exceed two thousand acres, state to be reimbursed from sale of lots; capital fund created therefrom, board may exercise power of eminent domain; said commission and School Land Commissioners to appraise value of lands and improvements separately; makes Oklahoma City, Guthrie, Shawnee candidates; provides for others by petition; proposes separately to determine questions:

(1)  Shall capital be located, and (2) Where.

     (  )  Yes.
     (  )  No.

Shall the capital of the state of Oklahoma be permanently located at :

|  |  |  |
|---|---|---|
| Oklahoma City | (   ) | Yes. |
| Shawnee | (   ) | Yes. |
| Guthrie | (   ) | Yes. |

The result is that the question, "Shall it [the bill] be adopted?" has not been voted on at all nor the bill adopted, unless, as is contended, an affirmative vote on the question, "Shall the capital be located?" is an affirmative vote on the implied question, "Shall it be adopted?" and for that reason is a substantial compliance with the statute.

In support of this contention it is urged, in effect, that the principal object of the bill was to secure at that time an expression of the voter on the question, "Shall the capital be located?" and that an affirmative vote on that question would necessarily include an affirmative vote for the adoption of the bill. On the other hand, it is contended, in effect, that the question, "Shall the capital be located?" was only one feature of the proposed bill, an affirmative vote on which cannot fairly be construed as a vote for the adoption of the entire measure. Assuming, as seems to be conceded by both sides, that a vote on the question, "Shall the capital be located?" was at that time properly before the electors, we are of opinion that the latter contention must be sustained for the reason, among others, that while the question, "Shall the capital be located?" gave the voter an opportunity to vote for or against one feature of the bill, it afforded him no choice to vote for or against the bill as a whole. To the conservative taxpayer, for instance, who took little interest in the capital controversy, but who came to the polls desiring to vote "No" only against the adoption of the bill, on the ground, say, that it carried an appropriation of $600,000, there was for him no place on the ballot to register his vote. When it comes to voting on a bill involving, as this does, an expenditure of public money, we can say as was said by the court in *Cain et al. v. Smith et al.*, 117 Ga. 902, 44 S. E. 5, where the questions submitted to the voters were "For

bonds and adoption" (of the proposed act), and "against bonds and adoption":

"The voters are entitled to have this question submitted to them so that they may pass upon it freely and untrammeled by any other consideration than the question whether the debt shall be incurred.   *   *   * "

To thus submit a bill by selecting therefrom what to designing persons interested in its passage might appear to address itself to the voter as its most persuasive feature, and thus secure its passage, would be in the nature of a fraud on the electorate of the state and not to be tolerated. As well might it be said, since that is also one feature of the bill, that an affirmative vote on the question, "Shall 2,000 acres of land be purchased?" would be an affirmative vote on the question, "Shall it be adopted?" or "Shall a Capitol Commission of three be appointed?" an affirmative vote for the adoption of the bill as a whole. To say, then, that by voting for the location of the capital (perhaps in the estimation of the voter a minor provision in the bill) he voted also for all the provisions in the bill including said appropriation, would be manifestly so unjust that we cannot so hold.

In *State v. School Dist. No. 1*, 15 Mont. 133, 38 Pac. 462, the questions which the school trustees were required to submit to the electors of the school district, and receive in favor thereof a majority of the votes cast at a certain election as conditions precedent to issuing certain bonds, were "(1) the amount of bonds; (2) the rate of interest which they shall bear; (3) the time when payable; (4) the time when redeemable; and (5) the purposes for which the money is to be used." They submitted to the electors only two of the propositions, viz., the amount of the bonds, and the purpose of the use of the money, wholly omitting to submit the second, third, and fourth propositions, viz., the rate of interest on the bonds, the time when payable, and the time when redeemable. In a suit to enjoin the issuing of the bonds, on the ground that they were not authorized by the proceedings taken as a foundation for their issuance, the court held that the trustees had not submit-

ted to the electors the questions which the law required to be submitted, and that those questions so omitted were, on consideration of an application to enjoin the issue of the bonds, vital and material and that the trial court erred in sustaining a demurrer to the complaint. The undoubted effect of this holding is that all the propositions required by law to be submitted, and for that reason vital and material to the reference, must be submitted or none, and that to single therefrom one or more, less than the whole, will not secure a fair expression of the voter on any, and for that reason the reference will fall. We are therefore of opinion that an affirmative vote on the question, "Shall the capital be located?" did not include an affirmative vote on the question, "Shall the bill be adopted?" and for that reason the initiated bill must fall. It will not do to say that the electors knew that by voting in the affirmative on the question, "Shall the capital be located?" they were so voting by implication on the question, "Shall it be adopted?" To practically this contention the court in *Lozier v. Alexander Drug Co.,* 23 Okla. 1, 99 Pac. 808, said:

"As to whether or not the electors, in voting on this proposition, understood that they were voting to repeal said article, and it was the intention of a majority of the electors of the state to so declare, this does not appear before this court in any way provided by law; but if it appears *aliunde,* the same cannot be considered by this court for any purpose."

Again, it will not do to say that an affirmative vote on the question, "Shall the capital be located?" included an affirmative vote on the implied question, "Shall it be adopted?" for the reasson that should this be true the illegality of the submission would continue to be apparent, as it has several times been held by this court in accord with the uniform holding of the courts that a submission is void where two propositions have been submitted so as to have one expression of the voter answer both propositions, and this for the reason that voters might thereby be induced to vote for both propositions who would not have done so if the question had been submitted singly. As the voter in this instance might have been against the adoption of the initiated

bill, but desirous of locating the capital in the event the bill carried, the questions should have been separately submitted to him that he might so express his will. This was the effect of the holding of the court in *Lozier v. Drug Co., supra,* where the court said:

"No opportunity was given the elector separately to express his will by his vote upon the question of the adoption or rejection of said provision as proposed to become a part of the Constitution nor to express such will as to whether or not said article 1 should be repealed."

To the same effect, see *Armstrong v. Berkley,* 23 Okla. 176, 99 Pac. 921; *State ex rel. City, etc., v. Allen, State Ad.,* 186 Mo. 673, 85 S. W. 531; *City of Denver et al. v. Hayes et al.,* 28 Colo. 110, 63 Pac. 311; *Village of Hempstead v. Seymour et al.,* 34 Misc. Rep. 92, 69 N. Y. Supp. 462.

We are therefore of opinion that the statute has not been substantially complied with; that as it was the intent of petitioners by the initiated bill to submit to the electors for their adoption or rejection at the polls three propositions, to wit, "Shall it [the bill] be adopted?" "Shall the capital be located?" "Shall the capital of the state of Oklahoma be permanently located at [one of three certain cities, naming them]?" that by reason of the failure to submit the first proposition, and the consequent failure of the bill to be adopted by the electors at the polls, the bill must fall, and with it the reference on the other two propositions. This is not only obvious, but is in keeping with the effect of the holding in *State v. School Dist. No. 1* (Mont.) *supra,* and with what seems to be the general doctrine that, where one of several material propositions required to be submitted fails for any reason to be adopted, the intent of the reference fails and with it the reference.

*Cain et al. v. Smith et al., supra,* was a petition for injunction. The facts alleged were that on December 2, 1902, an act was approved providing for a new charter for the town of Edgewood. Laws 1902, p. 175. The first section of the act repealed

an act incorporating the town. The second declared the same to be incorporated as a city under the name of the city of Edgewood. The third defined the corporate limits of said city which embraced more territory than within the corporate limits of the town. The next thirteen sections conferred upon the city authorities certain powers and provided for a formal government, etc. The seventeenth and eighteenth sections related to the establishment of a system of public instruction in the city. The nineteenth section authorized the city to issue bonds not to exceed $10,000, the proceeds to be used for the purpose of erecting school buildings and sites for the same. The twentieth section extended the corporate limits of certain territory for police purposes. The twenty-first section, in effect, provided that the act should go into effect upon its adoption by a two-thirds vote of the qualified voters of the city of Edgewood at a special election to be held for that purpose at a certain time and in a certain manner and under the same rules as elections for mayor and aldermen under said act; provided the notice and intention to hold the same had been given as required by a certain section of the Code; "and in said special election those voting for the adoption or ratification of this act shall have upon their ballot the words, 'For bonds and adoption,' and those voting against the adoption or ratification of this act shall have the words, 'Against bonds and adoption.' " It also provided that should the bill fail of adoption at the first election it might be again submitted to a vote at another election, etc., that an election was held at the time fixed by law, and that two-thirds of the qualified voters embraced within the territory described in the act as the city of Edgewood voted "For bonds and adoption." The suit was brought by certain persons who resided within the limits of said territory, and would be taxpayers and citizens of said city if the act were adopted, who prayed that the persons claiming to have been elected mayor and aldermen be enjoined from carrying the act into effect. The injunction was refused, and they appealed. The court after commenting on the Constitution said:

"It will thus be seen that the General Assembly has power to authorize a municipal corporation to have an election on the question of the establishment of public schools, and to have an election on the subject of incurring a debt; and also to authorize the persons to be affected by the creation of the municipal corporation to determine whether the corporation shall come into existence. The controlling question in the present case is whether the General Assembly has authority to provide that the qualified voters within a given territory shall pass upon all of these questions at one time. Has the General Assembly authority to provide for an election which may result in the creation of a municipal corporation, in the establishment of a system of public schools, and in the incurring of· a debt for this purpose, the voters being required to vote at the same time either for or against all of the propositions submitted?"

And, after holding that the Constitution did not permit a municipal corporation to incur debts such as the one proposed, except with the assent of two-thirds of the qualified voters thereon at a separate election for that purpose to be held as may be prescribed by law, and that the question of issuing bonds was not properly submitted at that election, and for that reason the bill must fall, the court in passing said:

"As stated above, the General Assembly had the right to incorporate the city of Edgewood, and prescribe, as a condition, precedent to incorporation, that the people to be affected by it should consent thereto. Considering the act as a whole, it is apparent that the General Assembly intended that the city of Edgewood should come into existence as a municipal corporation only in the event the election provided for in the twenty-first section of the acts should result 'For bonds and adoption'; that is, it was intended that this new municipality should not take its place among the municipalities of the state unless two-thirds of the qualified voters in the territory to be affected assented to three propositions—the creation of the municipality, the establishment of schools, and the incurring of a debt of $10,000 to provide for the same. The question was submitted by the General Assembly in this way, and it is therefore to be inferred that unless this could be done it was not the intention of the General Assembly to create the municipality."

—and reversed the judgment of the trial court refusing to grant the injunction.

We are therefore of opinion that when the initiated bill failed of adoption for the reason that the same was not submitted to the electors at the polls for their adoption, that all the questions voted on fell with it, leaving no law on the statute books providing for the removal or furnishing procedure for holding an election for the submission to the electors of the state the question of the removal and permanent location of the capital of the state, and that as defendants were attempting, without authority of law, to change the capital of the state from Guthrie, by removing therefrom to another place their offices and the paraphernalia thereof, which said change would involve an expenditure of public moneys, that an injunction will lie to restrain such unauthorized conduct; and, finding no error in the judgment of the trial court granting said injunction, the action of that court in so doing is affirmed.

All the Justices concur in the result.

———————

HAYES, J. (concurring). I concur with my brother Associate Justice TURNER in both his reasoning and conclusion upon the proposition that those provisions of the Enabling Act and of the ordinance of the Constitutional Convention accepting the terms of the Enabling Act which require that the capital of the state shall not be changed from Guthrie prior to the year 1913 are void, for the reason that it was not within the power of Congress to impose such condition upon the state, nor within the power of the state to consent thereto.

I also concur with him in his conclusion that there has been no legal submission of the initiative bill involved in this case by which it was attempted to locate permanently the capital of the state, to create a Board of Capital Commissioners, and to make certain other provisions; but I do not concur in all the reasoning upon which he has reached this latter conclusion. The grounds upon which I concur in this conclusion briefly stated,

without amplification, are these: The initiative and referendum provisions of the Constitution, as has been several times held by this court, are not self-executing, and for a procedure for the exercise of these powers reserved to the people we must look to the statutes enacted by subsequent legislation. Section 7 of an act approved April 16, 1908 (Sess. Laws 1907-08, p. 445), provides how the ballot title of each measure to be submitted to the vote of the people shall be formed, and requires that the ballot title shall be printed with the number of the measure on the ballot. Section 10 of the same act provides that where a question is submitted without a competing one, there shall be placed over it a brief catch line, and at the close of the question there shall be added:

|                            |          |       |
|----------------------------|----------|-------|
| Shall it be adopted?       | ("Yes")  | ( )   |
|                            | ("No")   | ( )   |
| or Shall it be repealed?   | ("Yes")  | ( )   |
|                            | ("No")   | ( )   |

By the same section, the voters are required to express their choice by placing a cross in the square and to the right of the word expressing their choice. By this method of voting upon any measure, the statute contemplates that each voter shall give one expression upon the proposed measure, which shall be either an expression affirmatively approving the entire measure or disapproving it in its entirety. It neither prescribes nor authorizes a procedure by which a proposed measure may be submitted to be voted upon other than as a whole, or as one proposition. In submitting this bill, which, for convenience, shall be referred to as the "Capital Bill," the question, "Shall it be adopted?" directed by the statute to be put upon the ballot, was not placed upon it, but in lieu thereof, the following questions were asked and placed upon the ballot:

Shall the capital of the state of Oklahoma be permanently located as provided in State Question, Initiative Petition No. ——?

("Yes")   ( )
("No").   ( )

and Shall the capital of the state be permanently located at:

| | | |
|---|---|---|
| Oklahoma City | Yes. | ( ) |
| Shawnee | Yes. | ( ) |
| Guthrie | Yes | ( ) |

If this constitutes a legal submission of this bill to the voters, then we have, as a result of said proceeding, a law that accomplishes, among other things, the following objects: (1) Locates the permanent capital at Oklahoma City. (2) Creates a State Capital Commission, fixes the term of office of its members and their salaries. (3) Authorizes the purchase or condemnation of land for capital purposes. (4) Appropriates $600,000 for carrying the provisions of the act into effect. Did the procedure followed give to every voter the opportunity by a single expression of his choice or by a single vote to approve or disapprove all the foregoing provisions of the law, as the procedure prescribed and required by the statute would have given him, if it had been followed. This ballot not only failed to give the voter such opportunity, but if it be valid, it authorized him to vote for some of the foregoing provisions and against others. Suppose A. and B. went to the polls to vote upon this measure. A. voted "Yes" upon the first question and quit. He did not vote for the law as it now stands. He voted at most for some of its provisions. That portion of the law which locates the capital at Oklahoma City received no expression from him. B., on the other hand, voted "Yes" upon the first question, and upon the second question voted "Yes" opposite "Shawnee." He did not vote for or against the entire law as it now stands, but for part of it and against part of it. Section 21 of the act of 1908 provides that the procedure therein prescribed is not mandatory, but if substantially followed shall be sufficient, and that clerical and mere technical errors shall be disregarded; but a variation in the procedure which requires two votes upon a proposed proposition in order to adopt it, whereas,

the statute provides that one expression shall be made, and which permits a voter to vote for a part and against a part of a proposed law, cannot be said to be a technical or clerical irregularity.

In our opinion a single proposed measure, as this bill, containing several alternative propositions cannot be submitted under the procedure now prescribed by the statutes of this state. This seems to have been the view of those charged with the duty of submitting initiative measures, for the existing statute in the preparation of the ballot was not observed, but the form prescribed by the proposed bill itself was followed. But a measure proposed by an initiative petition can no more prescribe a rule of action prior to the time it is adopted by the people, than a proposed bill in a Legislature prior to the time it receives the sanction of that body. To hold otherwise would render unnecessary any statute prescribing a procedure for the enforcement and application of the initiative provisions of the Constitution, for each proposed initiative measure might provide by its own provisions the method of its submission and all statutes be ignored.

Whether a statute may be legally enacted providing that measures proposed by the initiative or by a referendum may be submitted so as to have an expression of the voters upon the different sections or upon the different provisions of the proposed measure, or whether a statute may be legally enacted prescribing a procedure by which alternative propositions in the same bill may be submitted, as done in this case, is not necessary here to decide, for no such statute now exists.

I am authorized to say that Chief Justice DUNN and Justice WILLIAMS join in this concurrence.

KANE, J. (concurring). I believe that upon the acceptance of the terms and conditions of the Enabling Act by the Constitutional Convention by ordinance irrevocable as by section 22 of said act it was required to do, the part thereof which provides that "the capital of said state shall temporarily be at the city of Guth-

rie in the present territory of Oklahoma, and shall not be changed therefrom previous to *Anno Domini* 1913," became a compact between the United States and the people of the proposed state which can only be rescinded by the common assent of those who were parties thereto. That this compact should be protected by that sacred regard for plighted faith which should be cherished alike by individuals and organized communities. In my judgment, the opinion of the court ought to be based on the principle that, "Compacts are as obligatory upon states as upon individuals, and the fact that they enter into compacts that bind them shows that they are free."