CHARLES A. BLANTON v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

June 18, 1943.

No. 33,438.

[1]Reported in 10 N. W. (2d) 382.

*L. B. daPonte, Frederic D. McCarthy,* and *S. G. Fitzpatrick,* for appellant.

*Tautges, Rerat & Welch, Swanson, Swanson & Swanson; Frank J. Zima, Philip G. Eichelzer,* and *Amherst Tautges,* for respondent.

JULIUS J. OLSON, JUSTICE.

This was an action to recover damages for personal injuries

under the federal employers liability and safety appliance acts. 45 USCA, §§ 51 and 1, *et seq.* There was a verdict for plaintiff. Defendant's alternative motion for judgment or a new trial having been denied, it appeals from the order.

The accident occurred during the early morning hours (2:40 o'clock) of December 17, 1940, at defendant's Seattle yard. The weather was cold, and plaintiff was heavily clothed to meet that condition. He wore heavy woolen underwear, boots, overalls, a heavy woolen shirt, jacket, and overcoat. On his hands he wore leather mittens, the palm all in one piece with wool filler. At the time he was engaged with a switching crew consisting of a foreman and two other switchmen. The engine crew consisted of the engineer and fireman. He had already worked a complete shift of eight hours ending at midnight and when injured was engaged in work on the second shift beginning immediately thereafter. During the course of his work that morning, while dismounting from a "bad order" boxcar, he used the car ladder in doing so. This consisted of six grab-irons or handholds and a stirrup or step below the bottom of the lowest grab-iron. The lowest grab-iron was loose at one end. When reaching and stepping on it on the way down, he slipped because of its loose condition, his right foot went out from under him, and he lost his grip on the handhold. His foot went through the stirrup and was caught between it and the bottom of the car. He landed on his back with his foot thus caught. In his fall his back struck the rail of a near-by track. He described his condition as "dazed," that he "was knocked out temporarily. I didn't know how long I lay on the ground, whether it was half a minute or two minutes." He "felt numb all over. I felt paralyzed practically from my waist down." With the help of the members of the switching crew he was taken to a switch shanty near-by, where he remained for a few minutes, then to the north-end yard office, and from there he was taken in a car to the Seattle General Hospital and examined. The hospital record in respect to his condition at that time shows this entry: "injured back; * * * patient complains of severe pains in lumbar region." He was given a hypo

to relieve the pain. That same forenoon he was removed to the Northern Pacific hospital at Tacoma. Dr. Gullikson, the chief surgeon, who then examined him, concluded that plaintiff was suffering from a sacroiliac strain or disturbance. Here, too, he was given medication to relieve pain. The doctors who examined him there, after conference, concluded that he had sustained a sacroiliac disturbance on the right side of his back. On the first page of the hospital chart, entered in red ink, were the words "sacroiliac strain." That entry, so Dr. Gullikson testified, "indicates that that was our opinion of this case when he left the hospital." After remaining there about a week, plaintiff was furnished crutches so that he could get from his bed to the toilet. He left the hospital December 29, 1940, because he thought his treatments there were not proper. He did, however, go back there for further treatments as Dr. Gullikson had suggested.

The questions of defendant's liability and the extent to which plaintiff's condition was due to the accident were exhaustively considered and thoroughly threshed out in a lengthy trial. There is no reason to doubt that defendant's counsel deemed plaintiff's claim to be "deliberately created" to collect damages. Their professional faith in the justice of their client's defense is clearly disclosed by the record, which consists of some 950 pages. Further facts will be recited later. But we should first determine whether the case is one requiring the granting of defendant's motion for judgment.

In this behalf defendant asserts that "the proven and undisputed physical facts demonstrated to a certainty that it was physically impossible for the alleged accident to have occurred as claimed by plaintiff"; furthermore, that the evidence "overwhelmingly, unmistakably, definitely and truthfully showed that the plaintiff sustained no injury of any kind" at the time of the claimed accident, and that "the evidence demonstrated beyond question that the alleged accident never in fact occurred."

■ That plaintiff was working for defendant and while so working suffered an accident and was found lying on the ground, apparently helpless, by his fellow workers are facts not questioned in

the testimony. Whether the accident occurred "as claimed by plaintiff" may or may not be controlling on the question of liability. We do not find that the "physical facts" demonstrate "to a certainty," or otherwise, that the accident did not happen as related by plaintiff. Nor does the record disclose evidence which "overwhelmingly, unmistakably, definitely and truthfully" showed that plaintiff sustained no injury. Rather, the very opposite is what the jury found, and its finding on this score finds evidentiary support. That he was helped by his associates, forthwith taken to a hospital, and immediately thereafter treated for back injuries are facts amply proved. The same thing is true with respect to the claim that "the alleged accident never in fact occurred." To marshal the issues and to assemble all the evidence bearing thereon would prolong this opinion beyond reasonable limits. *Cf.* 1 Dunnell, Dig. & Supp. § 414, and cases under note 43. Reading the record as a whole leaves no doubt that these were issues of fact and that the jury's findings thereon cannot be disturbed. ·

■ A more difficult problem is presented by defendant's claim that plaintiff "obtained work with the defendant through fraud and misrepresentation of a material nature," and hence that he could not claim damages as an employe under such circumstances. To sustain that view, defendant cites and relies upon M. St. P. & S. S. M. Ry. Co. v. Rock, 279 U. S. 410, 49 S. Ct. 363, 73 L. ed. 766, quoting therefrom at pages 413-415, 49 S. Ct. 363, 73 L. ed. 769-770. We are not persuaded, however, that this case is applicable to the facts here appearing. If there was misrepresentation, the jury could have found that there was no causal connection between the misrepresentation and plaintiff's hurt. Furthermore, our own case of Borum v. M. St. P. & S. S. M. Ry. Co. 184 Minn. 126, 238 N. W. 4, affirmed in M. St. P. & S. S. M. R. Co. v. Borum, 286 U. S. 447, 52 S. Ct. 612, 76 L. ed. 1218, is more in point than the Rock case and we think sustains plaintiff's position in the instant case. One of the late cases on this phase is Laughter v. Powell, 219 N. C. 689, 694, 14 S. E. (2d) 826, 829, 136 A. L. R. 116. There the court reviewed a great many cases upon this subject and carefully dis-

tinguished them. The conclusion there reached appeals to us as sound. Said the court:

"Although the fact that an employee obtains employment by means of false statements may be ground for rescission of the contract of employment, it is insufficient to render such contract void or to terminate the relation of master and servant, or employer and employee thereby created."

*Certiorari* was denied by the United States Supreme Court in 314 U. S. 666, 62 S. Ct. 128, 86 L. ed. 533.

Plaintiff was examined by Dr. Willis for defendant and found physically fit. Nowhere is there any proof that he was in fact incapable of rendering good and efficient service or that the services rendered were unsatisfactory. Furthermore, there was a rule formulated by defendant, and in force during plaintiff's employment, which provided:

"A yardman or switchtender filing application for position will be notified within 90 days of the acceptance or rejection of his application. If not notified within 90 days (except men who enter service under assumed names) he will be considered accepted."

Plaintiff had worked more than 90 days when hurt and was never notified of having been rejected. The court submitted the question to the jury in a full charge, the meat of which reads:

"To constitute a defense, the burden of proof is upon the defendant to prove by a fair preponderance of the evidence that at the time of the application for employment made by the plaintiff to the defendant, plaintiff falsely and fraudulently made a material misrepresentation of the facts; that defendant relied upon such misrepresentation and was induced by such misrepresentations to employ plaintiff, and that such misrepresentation had some causal connection with plaintiff's accident and injury.

\* \* \* \* \*

"If, however, you find that the defendant has proved by a fair preponderance of the evidence that plaintiff did make false mis-

representations [representations], intended by him to deceive the defendant to gain employment, that defendant relied upon such representations as true, and gave plaintiff employment in reliance upon such untrue representations, and that plaintiff was in fact physically unfit for such employment, and that such physical unfitness was a cause of the alleged accident and claimed injuries, then plaintiff cannot recover and your verdict would be for the defendant."

Defendant's principal attack is directed against the question and answer contained in plaintiff's application for a job: "15. Have you ever suffered any physical injury? If so, state when, where and nature of injury." Plaintiff answered this "No." The evidence disclosed that in fact, while working for the Southern Pacific in 1925, he had been thrown through the window of a caboose and suffered injury to his nose. This brought about sinus trouble, which in turn caused dizziness, resulting in a fall from the top of a boxcar in 1928. Thereafter he was surgically treated for his sinus trouble and fully recovered therefrom. After his second injury he rendered many years of service in railroad work. In 1929 he was examined by Dr. Willis for the defendant and again in 1940. His testimony is that Dr. Willis gave him a thorough physical examination; that in discussing this and other minor injuries the doctor told him in effect that these were not matters of any particular consequence. The record does not indicate that there was anything wrong in his physical make-up. Rather, it impresses one with the truth of his assertion of being physically sound and possessed of the qualifications required in the service for which he was employed. Upon the facts and circumstances related and under the instructions of the court, we think the question was disposed of by the verdict.

■ The next question, requiring somewhat extended discussion, relates to the amount of plaintiff's recovery. The verdict was for $20,000. The case has been twice tried, the first ending in disagreement. In this instance it was for plaintiff by a five-sixths verdict.

As is usual in this class of cases, the experts widely disagree. Numerically speaking, defendant furnished more of that type than did plaintiff, but that did not make the case one for the court rather than the jury. Plaintiff's experts testified that his injuries were, as stated by the court in its memorandum,—

"serious, painful, permanent and disabling," such as would "prevent him from performing service as a railway employe, or any other work for which he had received training. The jury saw plaintiff and observed his physical condition and his difficulty in movement. There was evidence that his wages were considerably more than $200 per month [when injured] and his actual financial damage at the time of trial was approximately $3,000. There is nothing in the record nor from the observations of the court is there anything to indicate that the verdict was given under the influence of passion and prejudice."

The court concluded that the verdict should stand.

Plaintiff was a comparatively young man, 37 years of age, when the accident occurred. The trial took place some 16 months later. He was still incapacitated. Much of the time he could get around only by means of crutches. The nature of the injury and its extent and duration are matters concerning which the medical testimony differs greatly. We are not prepared to say that plaintiff's doctors were not competent to form and express honest opinions favorable to his claims. In sum, the conclusion of Dr. John P. Korchik, fortified by other experts, amounts to this:

"* * * there is no doubt in my mind that this man sustained a serious injury to his spinal column." His present condition is such that "there is a little motion at the right sacroiliac joint at the level of the second sacroiliac foramena in a transverse direction." Plaintiff, when walking, "has to swing his body to throw the leg forward, and the leg sort of rotates in a semicircle. And normally the iliopsoas muscle takes care of that. So that I feel that the iliopsoas muscle, either the fibres or the ligamentus insertive, has been stretched beyond the normal limits, and by this time nature

has attempted to heal this thing with a little scar tissue and every time he moves he is continually irritating it, and that is the explanation for the type of walk which he has and for some of the vague pains which he has little lower down."

While the verdict may be considered liberal, approved as it is by the trial court, we should not interfere.

■ We have examined the court's instructions to the jury to ascertain whether it erred in refusing to give certain requested instructions. The instructions given are, as a whole, a fair statement of the fact issues presented and embody the applicable rules of law for their guidance. The mere fact that the court did not use the exact language of the requested instructions does not militate against them, since, in substance, we think the requests were adequately covered by the court's general charge.

■ Defendant's 26th assignment of error reads:

"The court erred in instructing the jury as it did regarding Defendant's Exhibit 7, which was a statement taken from the plaintiff at Tacoma, Washington, for the reason that the instruction was based on Sec. 4, Chapter 289, Laws of Minnesota for 1929 [Minn. St. 1941, § 602.01 (Mason St. 1940 Supp. § 5687-8)], which law is unconstitutional for the reason that it embraces more than one subject, contrary to Section 27 of Article IV of the Constitution of Minnesota."

The constitutional question presented by this assignment has been before this court in numerous cases. We had occasion again to examine the cases and to apply them in State ex rel. Pearson v. Probate Court, 205 Minn. 545, 551, 287 N. W. 297, 300, where we said:

"The term 'subject,' as used in the constitution, is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. * * * All that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so

connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject." Other cases are cited at page 552.

And again, as we held in C. Thomas Sales System, Inc. v. Spaeth, 209 Minn. 504, 509, 297 N. W. 9, 13:

"A subject embraces all provisions which are germane to it; they may be parts of it, incident to it, or means auxiliary to the end in view. The subject must be single; the provisions by which the object is accomplished may be multifarious."

The title of the act, we think, deals with one subject, *i. e.,* the regulation of practices arising out of and in connection with personal injury cases. Our cases are cited in 15 Minn. Dig. Key No. 105, p. 543, *et seq.*

We see no need of going into an extended discussion of the problem presented. The applicable test has been quoted. Nothing need be added. We think the constitutional objection raised cannot be sustained.

While there are other assignments of error, a consideration of them leads us to the view that these are not of controlling importance, and, as such, we pass them without further comment.

Order affirmed.