In re INITIATIVE PETITION NO. 314,
State Question No. 550.

No. 55638.

Supreme Court of Oklahoma.

Nov. 25, 1980.

Rehearing Denied March 9, 1981.

George Miller, W. J. Winterstein, Jr., Miller & Dollarhide, Oklahoma City, for contestants.

John W. Swinford, D. Kent Meyers, John J. Griffin, Jr., Barbara L. Snow, of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for proponents.

J. C. Joyce, Frank Keating, Gerald Hilsher, of Blackstock, Joyce, Pollard, Blackstock & Montgomery, Tulsa, for amicus Cam-Coors, Inc.; Hilton Inn of Tulsa, Inc.; Camelot Inn, Inc., Sheraton Inn-Skyline East.

Neil E. Bogan, Grandon Dean Luthey, Jr., Jones, Givens, Gotcher, Doyle & Bogan, Inc., Tulsa for amicus Stephens Distributing Co.

SIMMS, Justice:

This matter comes before us on a timely protest to the validity of Initiative Petition No. 314, State Question No. 550, and objections to the count of signatures subscribed thereto. Such proceedings are authorized by 34 O.S.Supp.1979, § 8.

This action was ordered bifurcated and the evidentiary hearing on the protest to signatures was referred to a Referee of the Supreme Court. The legal issues raised by contestants directed at the sufficiency and validity of the petition itself were retained by the Court. Briefing time on pure legal issues was accelerated, and the Court heard oral argument.

Due to the pressing public question presented and the short time between oral argument and the deadline for the printing of ballots for the November 4, 1980, general election, this Court announced its decision by an order, with opinion to follow, that Initiative Petition No. 314, State Question No. 550, embraced more than one general subject and was invalid as violative of Const. Art. 24, § 1.

Contestants launched a frontal attack upon Initiative Petition 314, essentially urging that:

(1) It is a resubmission of the same measure presented to the people in 1978 by State Question No. 530, Referendum No. 223, and as such, under Const. Art. 5, § 6, the petition must be proposed by no less than twenty-five per centum of the legal voters, and;

(2) It is invalid on its face because it submits under one proposal multiple separate and distinct subjects in violation of the "one general subject rule" of Art. 24, § 1, supra, and deprives the voters of the opportunity to vote separately for or against each proposal submitted.

We address both propositions.

## I.

### RESUBMISSION

Const. Art. 5, § 2, provides:

"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of

votes cast at the last general election for the State office receiving the highest number of votes at such election."

Const. Art. 5, § 6, provides:

"Any measure rejected by the people, through the powers of the initiative and referendum, cannot be again proposed by the initiative within three years thereafter by less than twenty-five per centum of the legal voters."

The resubmission argument advanced by contestants presents two questions: First, is the initiative presenting State Question (hereafter S.Q.) 550, a resubmission of the rejected S.Q. 530; and second, if so, how many signatures are necessary to propose it; i. e., what is the meaning of "legal voters" in Art. 5, § 6, supra?

Const. Art. 27, § 3, requires all manufacturers of alcoholic beverages to sell their products to every licensed wholesaler who desires to purchase them on the same price basis and without discrimination. S.Q. 530,[1] rejected by the voters in 1978, proposed allowing territorial or marketing agreements between brewers of beer or cereal malt beverages and wholesalers. Section 3 of S.Q. 550 also proposes allowing territorial or marketing agreements between brewers of beer or cereal malt beverages and wholesalers.

Contestants argue that the purpose and object of both proposals are the same and that with only a few unimportant variations in language, the two proposals are virtually identical.

Proponents concede that there is "a similarity" between section 3 of S.Q. 550 and S.Q. 530 as they both permit brewers to enter into territorial or marketing agreements (beer franchising), but they contend that the similarity is confined to that single proposal and that section 3 is only a minor part of S.Q. 550.

The essence of proponents' argument is that S.Q. 550 must be viewed as a whole and that as a whole the measure proposes so many more changes than S.Q. 530, that the dissimilarities between the two greatly outnumber the one similarity of beer franchising.

Both parties rely on *In re Initiative Petition 271, State Question No. 408, Okl.,* 373 P.2d 1017, cert.den. 371 U.S. 949, 83 S.Ct. 502, 9 L.Ed.2d 498 (1962) as supporting their respective positions. There the Court was presented with a challenge to that initiative as being a resubmission of S.Q. 397 which had been defeated within the preceding three years. Both questions were reapportionment proposals, however the Court found that they were not the "same measure" because there were significant differences of substance between them.

Among the differences noted by the Court between the two measures were these: (1) the second petition did not guarantee each county a representative as did the first; (2) the second retained the limit of House members which the first petition removed; (3) the second created the vehicle for electing additional Senators while the first petition limited the Senate to 48 members. The Court found that because of the differences, the second initiative was a "substantially different measure" (At 1019) and was not a resubmission under Art. 5, § 6.

There are no differences of any substance between section 3 of S.Q. 550 and S.Q. 530. Contestants are correct that the minor changes in language between the two in no way varied their purpose, object or effect. They both allow brewers to enter into unrestricted franchising agreements.

If section 3 of S.Q. 550 had been submitted alone it would clearly be a resubmission described by Art. 5, § 6, under the guidelines of *In re Initiative Petition 271,* or any other test. The question then becomes, is section 3 any less a resubmission simply because it is set forth in an initiative containing many other proposals?

The answer is obviously no. Proponents' arguments that under *Initiative Petition 271* we must be confined in our analysis of the issue to comparing the entire "measure"

1. See, Appendix A.

of S.Q. 550 to the measure of S.Q. 530 and therefore find a multitude of "significant differences" are not well taken. *Initiative Petition 271* did not concern a situation such as we have before us and the Court there certainly did not envision a situation where a resubmitted measure would be buried in an initiative containing numerous additional proposals.

Under proponents' theory the same measure could be resubmitted without the requisite signatures so long as it was subsequently presented in a package containing changes in other areas. We emphatically reject such a holding, for it takes no imagination at all to realize that it would nullify Art. 5, § 6.

We find that section 3 of S.Q. 550 is a resubmission of the same measure rejected in S.Q. 530, and in doing so uphold the spirit and integrity of Art. 5, § 6.

We must next determine the number of signatures required to propose the resubmitted measure by the initiative. Section 6 of Art. 5 provides that any rejected measure cannot be again proposed by the initiative "within three years thereafter by less than twenty-five per centum of the legal voters."

What is the meaning of "legal voters"? Contestants submit that it is the total number of persons properly registered to vote.

Proponents argue that basic rules of construction require Sections 2 and 6 of Art. 5 to be construed together so that "legal voters" in Section 6 means the same as "legal voters" in Section 2; that both percentages are calculated from the number of votes cast in the last general election for the state office receiving the highest number of votes.

We have no decision directly on point although in *In re Initiative Petition No. 2, The New Jerusalem Proposition, 26 Okl. 548, 106 P. 823 (1910)*, while addressing the question of whether the particular joint resolution was either an initiative petition or a referendum within the meaning of § 6, so as to make the second measure a resubmission, the Court noted 106 P. at p. 823 that:

"It is further urged, however, that the same measure as this herein sought to be initiated was rejected by the people through the powers of the initiative and referendum at the general November election in 1908, and as this measure is proposed by less than 25 per centum of the legal voters, based upon the total number of votes cast at the last general election of the state office receiving the highest number of votes at such election, for that reason this petition is insufficient."

But the Court concluded 106 P. at p. 825 that:

"This, neither being a proposed constitutional amendment nor a measure initiated to become a law, was not rejected, and, never having been rejected, the fact that substantially the same measure may have within three years been sought to have been initiated by less than 25 per centum of the legal voters, and with over 8 per centum of such voters, would not thereby render such initiative petition insufficient. It follows that the contention of the appellants is without merit."

While this observation of the Court as to the meaning of "legal voters" is conceded by proponents to be dictum, it is, they urge, persuasive as the opinion was authored by Justice R. L. Williams, who was a member of the Constitutional Convention.

Basic principles of construction lead us to the conclusion that the Court's statement in *New Jerusalem* is correct and that the proper meaning of "legal voters" in § 6 means legal voters as defined by § 2.

■ Provisions of the Constitution relating to the same question should, of course, be construed together and harmonized with each other so far as possible. *Leach v. State, 17 Okl.Cr. 322, 188 P. 118 (1920); Okl. Nat. Gas Co. v. State ex rel. Vassar, 187 Okl. 164, 101 P.2d 793 (1940)*. In construing sections relating to the initiative and referendum therefore, we have held that it is proper to consider them with other sections relating to the initiative or referendum. *See, e. g., Norris v. Cross, 25 Okl. 287, 105 P. 1000 (1909); In re Initiative*

*Petition No. 2 of Cushing,* 157 Okl. 54, 10 P.2d 271 (1932).

■ We find that legal voters of § 6, Art. 5, means the same thing as legal voters defined by § 2. Both sections use the phrase in the same context; the purpose of both sections is the same—to establish the number of signatures necessary to propose a measure. The only question is which percentage should be applied.

Contestants' reliance on *Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton,* Okl., 501 P.2d 1089 (1972) is not well taken for there we were concerned with questions regarding the constitutional and statutory provisions governing a circulator of an initiative petition. The Court found that the legislature did not intend to require circulators to be registered voters because the purposes of restrictions on signers of petitions and those on circulators are separate and distinct. *Shelton* is not applicable to the situation before us where "legal voters" has the same meaning in both related sections.

Additionally, proponents correctly assert that if we were to adopt the contestants' view of "legal voters" as all voters properly registered, we would only create a problem without any practical solution—for what date would we establish as the point of inquiry? The date of the last general election, or of filing the petition, or of circulating the petition, or perhaps some other date? Then, no matter which date was chosen, how could it be determined how many *properly* registered voters there were at that time. As proponents point out, due to many occurrences, such as death and moves out of state, it is impossible to determine with any certainty the number of properly registered voters on any given day. Such a holding would only create, without legislative sanction, a new subject of factual dispute for judicial determination.

In *In re Petition No. 281, State Question No. 441.,* Okl., 434 P.2d 941 (1967) we found that the purpose of the Constitutional language of § 2 of Art. 5, "last general election" is to establish a "specific, definite and unambiguous date" (at p. 950), that being the most recent election for state office as of the date the petition in question is filed.

For the same reasons it is necessary to establish a specific, definite and unambiguous number of "legal voters" from which the proper percentage may be calculated. That fixed number is established by § 2 of Art. 5.

The last general election was held November 7, 1978, and the state office which received the largest number of votes was Governor. Votes for that office totaled 777,414. Twenty-five per cent of that number is 194,354.

■ We conclude that because Initiative Petition No. 314 is a resubmission under Art. 5, § 6, it must bear at least 194,354 valid signatures.

Our disposition of this case renders contestants' application for additional time to review signatures moot.

## II
### ART. 24, § 1

As set forth in our previous order, we have determined that Initiative Petition No. 314, presenting S.Q. 550, violates Art. 24, § 1, and is invalid. It contains more than one general subject and the voters are not able to vote separately for or against each proposal.

Section 1 provides:

"Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two (2) houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals and referred by the Secretary of State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds (⅔) vote of each house, shall order a special election for that purpose. If a majority of all the electors voting on any proposed amendment at such election shall vote in favor thereof, it shall thereby become a part of this Constitution.

"No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition."

The arguments of the parties and the authorities upon which they rely follow.

Proponents first contend that Art. 24, § 1 is not applicable to initiative petitions. They next argue that even if we should hold that it is applicable, the initiative does not violate the single subject requirement for it has but one general subject which is control of alcoholic beverages.

■ Section 1 of Art. 24 is clearly applicable to initiative petitions. *In re Initiative Petition No. 271, supra.* Proponents originally submitted no authority in support of their argument to the contrary. They ultimately filed an untimely brief citing authority which we find does not sustain their position. We address the issue further only because the matter of the initiative process is of vital importance to the people of Oklahoma and there should not be any doubt as to the applicability of the single subject rule to initiative petitions.

*Atwater v. Hassett, 27 Okl. 292, 111 P. 802 (1910)* contains two sentences 111 P. at p. 804, upon which proponents rely as standing for the view that the Court considered the section inapplicable to the initiative:

"This amendment not having been submitted by virtue of section 1, art. 24, supra, the same has no application to this case. Said amendment was submitted on an initiative petition."

We do not so interpret the statement. Proponents take this statement out of context. Viewed in the context of the question before the Court, which was whether an initiative could be submitted for vote at a primary election rather than a general elec-

tion, it is clear that the Court merely found that Art. 5, § 3 specifically controlled that question.

Sections 1 and 3 of Article 5 are discussed by the Court prior to the sentences upon which proponents rely. That, together with inclusion of the words following those cited by proponents, explains the thrust of the Court's statement:

"This amendment not having been submitted by virtue of section 1, art. 24, supra, the same has no application to this case. Said amendment was submitted on an initiative petition. Under section 3, art. 5, Const., said amendment was required to be submitted 'at the next election held throughout the state.' Further, the Governor issued his proclamation calling for an election for said date at which said proposed amendment was to be submitted."

That the Court's statement in *Atwater* was limited to the question before it, is underscored by the fact that in two other decisions, the same court speaking through the same author[2] held that Art. 24, § 1 is applicable to the initiative as to other questions. In *Trapp v. Wells Fargo Express Co., 22 Okl. 377, 97 P. 1003 (1908),* the Court held that because the initiative does come within the section, the Secretary of State had certain duties in preparing the measure for election such as responsibility for printing, forwarding and transporting supplies and payment of costs therefor. And in *State ex rel. Caldwell v. Hooker, 22 Okl. 712, 98 P. 964 (1908),* the Court specifically found that Art. 24, § 1, governed the number of votes necessary for approval of a constitutional amendment proposed "either by the legislature or by the initiative, when submitted at a general election." (98 P. at 969).

More germane to the issue before us is a more recent decision, *Associated Industries v. Oklahoma Tax Commission, 176 Okl. 120, 55 P.2d 79 (1936),* where an initiative was challenged for, among other things, violating Art. 24, § 1. The Court issued a perma-

**2.** Justice R. L. Williams.

nent injunction restraining enforcement of Initiative Petition No. 144, concerning old age pensions after the amendment had been submitted and adopted by the voters, holding that because of failures to comply with statutory procedure the measure had not been legally submitted to the voters for approval or rejection and therefore had not been approved by the people in accord with the Constitution. Although the decision was based on other grounds, the Court noted the importance of an Art. 24, § 1, challenge to an initiative:

"Nor is it necessary to determine the contention of petitioners that several provisions of the Constitution are in fact amended by said initiative measure in violation of section 1, article 24 of the Constitution which provides that if two or more amendments are proposed they shall be submitted in such manner that electors may vote for or against them separately. We allude to these serious contentions for the purpose of pointing out the importance of a substantial compliance with the constitutional and statutory provisions relating to the exercise by the people of this reserved power." (55 P.2d at 86–87)

Although the observation is dictum, it is another clear indication that proponents' notion that prior to its amendment in 1952 the Court considered Art. 24, § 1, inapplicable to initiatives, is entirely unsupported.

It should also be noted that the single-subject requirement has been addressed and held to apply to an initiative petition as a matter of general law without reliance on, or even mention of, Art. 24, § 1. See, e. g., *Smith v. State, 28 Okl. 235, 113 P. 932, 940–42 (1911)*; as applying to initiative petition submitted to voters of a municipal corporation under Art. 18, see, *Turner v. Ramsey, 63 Okl. 199, 163 P. 712 (1917).*

In short, we reject proponents' argument that the Court's statement in *Atwater* is controlling even as to the Court's view of the applicability of Section 1 of Art. 24 prior to the 1952 amendment. It was held applicable to initiative proposals prior to its 1952 amendment and it was determined applicable after its amendment. *In re Initiative Petition 271, supra.* Proponents present nothing to dissuade us from that position. To hold otherwise would also negate both the spirit and the letter of Const. Art. 5, § 8, which provides: "Laws shall be provided to prevent corruption in making, procuring, and submitting initiative and referendum petitions."

Having determined that the one general subject limitation of § 1, Art. 24 does apply to the initiative we turn to the application of same to Initiative Petition No. 314.

Contestants submit that the proposed initiative exploits the initiative process by containing at least four separate and distinct subjects: (1) unrestricted franchising arrangements for brewers; (2) on-premises consumption; (3) unlimited advertising; and (4) control of liquor traffic by non-residents.

We have prepared a summary of the changes in the existing Article 27 proposed by Initiative Petition 314. This list is not meant to be exhaustive, only illustrative. For convenience Art. 27 and Initiative Petition 314 have been reproduced side by side and are set forth in Appendix B.

Amendments to § 3 include the following: (1) prohibited franchising agreements would be permitted between brewers and wholesalers; (2) a constitutional distinction between wholesalers of beer and wholesalers of alcoholic beverages is created; (3) creating, as set forth in Section 4, retail sales licenses for formerly prohibited on-premises consumption outlets and retail package stores; (4) providing that licensed wholesale distributors of alcoholic beverages shall sell beverages only to licensed retail package stores; while (5) allowing wholesale distributors of beer or cereal beverages to sell to any or all on-premises outlets and all or any licensed retail package stores in their marketing area; and Providing for passage of consistent laws by the legislature.

Amendments to § 4 include:

(6) removing the prohibition against "open saloon" and adding on-premises consumption as a lawful retail sale;

(7) allowing package store licensee to sell to a licensed retail consumption outlet;

(8) allowing sale or gift of "liquor by the drink" by privately owned licensed on-premises outlets;

(9) allowing on-premises licenses to be issued to corporations as well as partnerships and individuals;

(10) providing that no restrictions shall be placed on the number of licenses which may be issued to any licensee;

(11) fixing on-premises license fees in the constitution at $1000.00 and provides for annual renewal;

(12) amending, only by implication, § 7, Art. 27 by earmarking forty per cent of the licensing fee for retail on-premises licenses for the Department of Mental Health for rehabilitation and treatment programs.

Section 5 amendments are:

(13) reducing from felony to misdemeanor the offense of selling alcoholic beverages to minors or other designated persons and adding requirement of "knowingly selling or furnishing" same;

(14) changing provisions for license revocation for violation by replacing that a license "shall" be revoked upon conviction with "may" and adding subsequent hearing procedure before Alcoholic Beverage Control Board with additional requirement that the State bear the burden of proof to show good cause for such revocation;

(15) allowing unrestricted advertising by any licensee excepting only signs outside retail stores; removing prohibition against all advertising;

Section 6 amendments are:

(16) provision excepting licensed retail on-premises outlets from prohibition of retail sales by package stores on specified days but for that time during which the polls are open on election day, and between 2:00 a. m. and 10:00 a. m. of every day;

(17) changing provision for license revocation for violation of the section by replacing "shall" be revoked upon conviction with "may" and adding subsequent hearing procedure before the Alcoholic Beverage Control Board with additional requirement that the State bear the burden of proof to show good cause for such revocation;

Amendments to Section 10 include:

(18) deleting restriction on issuance of a retail package store or wholesale distributors license in (d) pertaining to a person or partner who held a Federal Liquor Stamp while a resident prior to the adoption of the Act.

New provisions pertaining to licensing of on-premises outlets allow licensing of:

(19) corporations subject only to requirements that they are properly incorporated or domesticated to do business and in good standing on the date of application, and the officers are at least 21 years old;

(20) a partnership, general or limited, where only one partner, including a limited partner, is a resident on the date of the application, the general partners are 21 and have not been convicted of a felony;

(21) individuals who are over 21, residents on the date of the application and have not been convicted of a felony.

It goes without saying that these proposals would substantially and significantly change Art. 27 in important respects. Art. 27 prohibits franchising agreements, on-premises consumption and advertising. Among other things, Initiative No. 314 proposes allowing all three.

The issue of single-subject limitation on proposed constitutional amendments has been the subject of much litigation.

It is agreed that the seminal decision on the subject is *State ex rel. Hudd v. Timme, 54 Wis. 318, 11 N.W. 785, (1882),* where the general rule was set forth that submission of separate amendments is required where the proposed amendments have at least two

separate and distinct purposes in view, which are not dependent upon or connected with each other. It is also agreed that while all the cases use substantially the same language, it is often difficult to reconcile the results reached.

This point is brought home in the action before us as both sides cite numerous cases which use the same language but appear, at least on the surface, to reach opposite results and the parties sometimes rely on different portions of the same decisions.

Many of those decisions however, are not inherently inconsistent. To understand any series of cases on any rule of law, one must look at the underlying purpose behind the rule. The underlying purposes of the single-subject rule have been set out many times and we quote here from the recitation in *Fugina v. Donovan, 259 Minn. 35, 104 N.W.2d 911, 914 (1960),* set forth following that court's observation that the decisions appear to be characterized as taking either a narrow or a more liberal view of the rule:

> "These differing attitudes appear to arise from differences in emphasis of the objectives sought. The constitutional mandate that multifarious amendments shall be submitted separately has two great objectives. *The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent 'logrolling', or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts.*" (E.A.) [3]

Viewing the decisions from this perspective many of the seeming inconsistencies disappear, for closer examination reveals that the decisions whether explicitly stated or not, were based upon judgments by the courts as to whether the purposes behind the rule were offended by the particular proposals. Some decisions which appear at first blush to hold only that A and B are related subjects that may be presented as a single proposal, are actually determinations that the purposes of the rule were not offended under the circumstances. And the converse is true, of course.

With that note of caution, we shall examine some of the leading decisions cited by the parties.

In *Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 94 A.L.R. 1502 (1934),* another often cited opinion, the court struck down an initiative measure adding three sections to an article of the constitution which would have (1) placed a new tax on copper production, (2) created a new method of assessing public utility property, and (3) created a new tax commission. The proponents of the measure argued that each provision related to the general subject of "taxation". The court spoke at great length of the "pernicious practice of 'logrolling'" (36 P.2d at 551, 552) which the constitutional provision was intended to prevent, reviewed the *Timme* case and other authorities, and explained and clarified the rule as follows:

> "If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a docu-

**3.** This legal philosophy is embedded in Art. 24, Sec. 1, which reads in part: "The voters shall vote separately for or against each proposal submitted * * *."

ment was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." 36 P.2d at 554.

Applying the test to the proposed amendment the court said:

"It is evident that there are at least three distinct propositions contained therein, no two of which are necessarily required for a proper operation of the third. On their face they have no direct relation *to each other*. Their only connection is that they are all embraced in a broader general subject, to wit, that of taxation. It is clear that the provision in regard to the method in which copper mines should be taxed is in no way necessary to or concerned with the method of taxation of public utility corporations, and it is equally clear that both of those propositions could be inserted in the Constitution without slightest need of adopting the one establishing the tax commission as a constitutional body which in effect would be independent of the regular executive and legislative branches of the state government in many particulars, and perhaps even of the judicial." (36 P.2d at 554–555)

The court found the amendment was "logrolling of the worst type" violating both the spirit and letter of the constitution, as it submitted three separate propositions to the voters upon which each voter would have different opinions but must either reject all three "on account of one which they may consider vicious, or else accept two provisions they disapprove to secure the adoption of one which meets their favor." 36 P.2d at p. 555.

*Fugina v. Donovan, supra,* is cited by proponents as authority to permit the submission of all proposals in one amendment based upon the "liberal" test of a "rational relationship to a single purpose, plan, or subject;" that being in this case, control of alcoholic beverages in the view of proponents. Examination of *Fugina,* however, primarily shows only that the court was of the opinion that the proposals there presented, (1) permitting the legislature to extend the term of session 30 days, (2) permitting legislators to serve as notaries and (3) permitting legislators to seek election to other offices, did not violate the underlying purposes of the constitutional prohibition as the amendment was simple and clear and not misleading. The court was explicitly reluctant to uphold the amendment and did so only because under the weighing test it employed to determine a "rational relationship", the changes effected were not particularly important. The court said:

"In determining whether there is a rational relationship in purpose, plan, or subject of two or more propositions, we can, and indeed must, weigh the relative importance of the propositions. Most sections of the constitution contain a number of provisions, some of greater and some of less importance. It would obviously be unreasonable even by the most strict and narrow view to require that every alteration or amendment of any phrase, clause, or provision of the constitution be submitted for a popular vote as a separate proposition. Whether particular proposals can be combined, therefore, necessarily requires a judgment both as to the relationship between them and as to their relative importance.

"For example, permitting legislators to serve as notaries, as is now proposed hardly involves any significant change in our structure of government. On the other hand, it may be a great convenience to many members of the legislature. Accordingly, it can reasonably be included as a subordinate provision in an amendment which may require 30 days' additional service at each session. This does not necessarily imply that it would be proper to present as a single proposed amendment a provision for extending the term of the legislature and a provision establishing the basis of representation.

We intimate no opinion as to whether or not these propositions might properly be joined, but use this merely as an illustration of propositions whose significance might require separate submission to the voters even though the present proposal is held proper." 104 N.W.2d 911 at 914–915.

\*     \*     \*     \*     \*     \*

"The proposal is simple and clear enough to be understandable to an ordinary citizen and is not misleading. While the logical relationship between the propositions involved is somewhat remote, and perhaps as remote as is permissible, yet it exists; and the relative importance of the propositions makes it not unreasonable that they be joined." 104 N.W.2d at 915.

Both sides rely on *Amador Valley Joint Union High School District v. State Board of Equalization, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978),* the Supreme Court of California's decision upholding the nationally publicized Proposition 13. We find that *Amador* fully supports our decision in this case. The measure added an entire article to the constitution and its four provisions changed California's existing system of real property taxation and tax procedure by imposing important limitations upon the assessment and taxing powers of state and local governments.

The court reviewed its first decision construing its single-subject constitutional requirement, *Perry v. Jordan, 34 Cal.2d 87, 207 P.2d 47 (1949),* where it had applied and adopted the "reasonably germane" test previously developed from cases concerning a similar restriction applicable to legislation. In *Perry* the challenged initiative concerned repealing constitutional provisions governing aid to the aged and blind with some collateral effects, and the court noted that in rejecting the single-subject challenge, it had observed that:

"All those things obviously pertain to any plan—single subject—of aid to the needy aged and blind. They are merely administrative details." (Id., at p. 94, 207 P.2d at p. 50.)" 583 P.2d at p. 1290.

The court also noted the more restrictive test that provisions must be "functionally related in furtherance of a common underlying purpose" which had been advocated in a dissenting opinion of a recent decision.

The court then applied *both* tests—"reasonably germane" and "functionally related in furtherance of a common underlying purpose"—to Proposition 13 and for these reasons found it acceptable under both:

"As previously noted, article XIII A consists of four major elements, a real property *tax rate* limitation (§ 1), a real property *assessment* limitation (§ 2), a restriction on *state* taxes (§ 3), and a restriction on *local* taxes (§ 4). Although petitioners insist that these four features constitute separate *subjects*, we find that each of them is reasonably interrelated and interdependent, forming an interlocking "package" deemed necessary by the initiative's framers to assure effective real property tax relief. Since the total real property tax is a function of both rate and assessment, sections 1 and 2 unite to assure that *both* variables in the property tax equation are subject to control. Moreover, since any tax savings resulting from the operation of sections 1 and 2 could be withdrawn or depleted by additional or increased state or local levies of other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes. Although sections 3 and 4 do not pertain solely to the matter of *property* taxation, both sections, in combination with sections 1 and 2, are reasonably germane, and functionally related, to the general subject of property tax relief." At pp. 1290–1291.

Discussing the underlying purposes of single-subject requirements, the court noted that they are intended to minimize the risk of voter confusion and avoid exploiting the initiative process by combining in a single measure several provisions which might not command majority support if considered separately—logrolling. The court took judicial notice of the massive publicity and discussion which preceded the election and the elaborate and detailed explanation of

the various elements of Proposition 13 which had been mailed to every registered voter, and found that those circumstances diluted the risk of confusion or deception created by including four features of the article in one proposition.

The court held that as the provisions were interdependent and the purposes of the single-subject rule were not offended, the amendment was valid:

> Unlike the enactment condemned in Kerby, however, the four elements of article XIII A not only pertain to the general subject of taxation, but also are reasonably interdependent and functionally related to each other. More importantly, no apparent 'logrolling' is involved in this case. Each of the four basic elements of article XIII A was designed to interlock with the others to assure an effective tax relief program." At p. 1291.

We have addressed the single-subject limitation of Art. 24, § 1.[4] In *Rupe v. Shaw, Okl., 286 P.2d 1094 (1955),* we first considered the section after its amendment in 1952 in reviewing, after submission and approval by the voters, a Joint Resolution which amended Art. 10 and added sections thereto. While the decision is not precisely on point as it primarily concerned a challenge to the ballot title, the Court did consider objections to that title based on Art. 24, § 1 as well as a contention that the title was misleading because of participation of a state park and a memorial in an appropriation titled "State Institutions."

The ballot title was found to be not misleading and entitled to be presumed sufficient because it had been approved pursuant to statute. The Court relied extensively on *Perry v. Jordan, Cal., supra,* discussed at length by the Supreme Court of California in *Amador, supra,* and in adopting the view that constitutional provisions should receive a liberal, rather than a narrow or technical construction, and set forth the following criteria from *Perry* which were applied in determining that multiple subjects were not submitted:

> "We think this general purpose was sufficiently declared in the resolution and, this being true, the details provided for its accomplishment in the law thereafter enacted may be regarded as incidents, *Perry v. Jordan,* supra, 'necessary or convenient or tend(ing) to the accomplishment of one general design notwithstanding other purposes than the main design may be thereby subserved.'" (At 1097)

*In re Initiative Petition No. 271, Okl., 373 P.2d 1017 (1962),* discussed above, concerned the initiative proposing reapportionment. It was held consistent with the guidelines of *Rupe* and not violative of Art. 24, § 1, as it embraced but one subject, reapportionment, and the other provisions therein were "incidental" and "supplemental" to that general purpose. The Court stated:

> "All the other provisions, such as setting up a committee for its enforcement, are supplemental to the general purpose. No cases in point are cited by protestants on this issue. Reference is made to only two instances in which any subject other than reapportioning is treated. One is the provision for the committee consisting of the Attorney General, the Secretary of State and the State Treasurer, who shall reapportion under the provisions of the initiative petition and the provision on filing of candidates for legislative offices with the State Election Board instead of the Secretary of the Election Board. These are incidental to the general plan of reapportionment." At 1019.

See, also generally, *Adams v. City of Hobart, 166 Okl. 267, 27 P.2d 595 (1933).*

Both parties have directed our attention to *Modern Alcoholic Beverage Control v. Shelton, Okl., 501 P.2d 1089 (1972),* where we declined consideration of a challenge under Art. 24, § 1 to an initiative presenting franchising, advertising and "liquor by the drink", citing *Threadgill v. Cross, 26 Okl. 403, 190 P. 558 (1919).* It was pointed out in *In re Supreme Court Adjudication,*

---

4. As previously mentioned, other decisions have imposed the one subject limitation as a general principle of law. See also: *Lozier v.*

*Anderson Drug Co., 23 Okl. 1, 99 P. 808 (1909); Armstrong v. Berkey, 23 Okl. 176, 99 P. 921 (1909).*

*Etc., Okl., 534 P.2d 3, 8 (1975)* that the initiative procedure statute existing when *Shelton* was decided, was subsequently amended (34 O.S.Supp. 1973, § 8) and administrative duties previously placed with other state officers were legislated directly to this Court. It was further explained that this Court is not limited to those duties of such officers and may consider challenges to the constitutionality of initiative and referendum measures to prevent a costly and useless election. We recognize that in his dissenting opinion in *Shelton*, Justice Hodges correctly analyzed the violation of Art. 24, § 1 presented by combining these three subjects in one proposal. We adopt those views here.

■ We have examined the decisions cited by counsel and have examined many others on our own, and we conclude that this Initiative Petition does not pass either the "liberal" test urged by proponents or the more restrictive test urged by contestants. It is clear from the decisions that no matter how the courts characterize the test they apply, they examine the inherent nature of the provisions to determine whether they are subjects which are separate and independent from each other so that each could stand alone, or fall as a whole, leaving the constitutional scheme harmonious and independent on that subject. Even those decisions which pronounce a "reasonably germane" standard, impose the critical criteria of "incidental", and "supplemental" (*In re Initiative Petition 271, supra*) or being an "administrative detail" (*Perry, supra*). Even under the "rational relationship" test (*Fugina*), the initiative fails for each of the major proposals—advertising, franchising and liquor by the drink—is an important, substantial change in our constitution. None is reasonably "subordinate" to the other. There is no interdependence between proposals permitting advertising, franchising and liquor by the drink. Allowing franchising is not incidental or supplemental to permitting advertising, nor is it an administrative detail. They are certainly not so "interrelated and interdependent" that they form an "interlocking package" (*Amador*) and they do not have a common

underlying purpose, as each proposal has its own purpose.

More importantly, in analyzing the amendment in light of the purposes underlying the single-subject restriction, we find that it is misleading to the voters and borrowing from *Kerby*, it is "logrolling of the worst type."

Combining proposals to allow unlimited advertising of alcoholic beverages and franchising agreements with a proposal to allow on-premises consumption was no accident. The voters in favor of "liquor by the drink" for instance, are not afforded freedom of choice. In order to secure that part of the proposal they desire, they are compelled to accept the entire proposal although perhaps not approving of and in fact opposing advertising of alcoholic beverages and/or franchising agreements.

We are aware that many people consider Initiative No. 314 the "Liquor By The Drink" petition although, viewed as a whole and objectively, the allowance of liquor by the drink is but a portion of the entire proposal. Additionally, we could not help but notice that many of the provisions proposed for franchising and licensing on-premises outlets are designed, with no small subtlety, to work to the exclusive benefit of special interest groups at the expense of a misled public.

Proponents have contended that finding this initiative measure violative of the single subject provision will result in "splintered" submissions and leave the public without means of implementing integrated reform through the initiative process.

It does not. In keeping with the restriction as it has been construed in this state and other states, as discussed above, submissions may properly contain incidental and supplemental provisions. In this regard for instance, licensing provisions for on-premises outlets would be properly included in a proposal permitting on-premises outlets. Also, it is a matter of history and common knowledge that the subjects of liquor by the drink and franchising have each been separately submitted to and rejected

by the voters. That fact alone takes considerable impetus away from proponents' splintered submission argument.

The changes sought by the multifarious proposal could have been effected either by submission of three separate proposals or a submission amending, under Art. 24, § 1, the entirety of Art. 27, as an amendment by article, as was done in 1959 when prohibition was repealed and Art. 27 was submitted and adopted by a vote of the people.

Proponents contend that our decision jeopardizes the sanctity of the initiative process assured by Art. 5, § 1, but we take this opportunity to point out that it may only be preserved by requiring the people to submit lawful initiatives.

In *Associated Industries, supra, 55 P.2d 81–82,* we observed that:

"Courts do not concern themselves with the expediency or wisdom of laws, but only with their legality. The social and economic policies affecting the general welfare of the people are committed exclusively to the legislative branch of government, and by our fundamental concept of government, the judiciary is not permitted to interfere therewith except in so far as the legislation may transgress fundamental legal restrictions. The chief executive may recommend, and the Legislature may enact, or the people, exercising their reserved power, may initiate and approve at the polls, any legislation they may deem advisable. But in order to safeguard and protect and enforce any and all restrictions placed upon the legislative power by the Constitution adopted by the people, it is for the courts, when their jurisdiction has been properly invoked, to inquire into and guard carefully the manner in which such legislation is enacted. It must be remembered that the people solemnly adopted a Constitution containing certain restrictions not only against its delegated officers and its established departments but also upon the people themselves, to the end that the Constitution should be perpetually maintained and upheld. Subject to the limitations imposed by the Federal Constitution, the reserved power of the people of the state to amend their Constitution is unlimited. But this power must be exercised in substantial conformity to the provisions of the Constitution itself. Courts can approve only those acts of the people which are in substantial conformity with the procedure provided by or under authority of the Constitution."

And in *In re Initiative Petition on Proposed Charter for City of Okmulgee, 89 Okl. 134, 214 P. 186,* the Court set forth the following which is very relevant here:

"If we apply the principles of constitutional law to the situation thus presented, we find that it is well settled that a constitution can be neither revised nor amended except in the manner prescribed by itself * * *, and that any attempt to revise or adopt a new constitution in any other manner than the one provided in the existing instrument, is almost invariably treated as extraconstitutional and revolutionary. * * * In other words, while it is universally conceded that the people are sovereign and that they have power to adopt a constitution and to change their own work at will, they must, in doing so, act in an orderly manner and according to the settled principles of constitutional law. And where the people, in adopting a constitution, have prescribed the method by which the people may alter or amend it, an attempt to change the fundamental law in violation of the self-imposed restrictions, is unconstitutional. * * *" 89 P.2d at 187–188.

INITIATIVE PETITION NO. 314, STATE QUESTION NO. 550, IS INVALID AND ORDERED STRICKEN FROM THE BALLOT.

IRWIN, V. C. J., and WILLIAMS, HODGES and BARNES, JJ., concur.

OPALA, J., concurs specially.

LAVENDER, C. J., and DOOLIN, J., concur in part, dissent in part.

HARGRAVE, J., dissents.

APPENDIX A

STATE QUESTION 530

(Proposed 1978)

### § 3. Enactment of laws by legislature—Indiscriminate sales to licensed wholesale distributors

The Legislature shall enact laws providing for the strict regulation, control, licensing, and taxation of the manufacture, sale, distribution, possession, and transportation of alcoholic beverage, consistent with the provisions of this Article. Provided, that any manufacturer, or subsidiary of any manufacturer who markets his product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker or importer of alcoholic beverage, bottled or made in a foreign country, either within or without this state, shall be required to sell such brands or kinds of alcoholic beverages to every licensed wholesale distributor who desires to purchase the same, on the same price basis and without discrimination, and shall further be required to sell such beverages only to those distributors licensed as wholesale distributors. Provided, however, that any brewer of beer or cereal malt beverage and any licensed wholesale distributor of such beverage shall have the right to enter into territorial or marketing arrangements or agreements deemed suitable or desirable by the parties thereto to facilitate the marketing of such product. All laws passed by the Legislature under the authority of the Article shall be consistent with this provision.

## APPENDIX B

### ART. 27

### § 3. Enactment of laws by Legislature—Indiscriminate sales to licensed wholesale distributors.—The Legislature shall enact laws providing for the strict regulation, control, licensing, and taxation of the manufacture, sale, distribution, possession, and transportation of alcoholic beverage, consistent with the provisions of this Amendment. Provided, that any manufacturer, or subsidiary of any manufacturer who markets his product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker, brewer, or importer of alcoholic beverage, bottled or made in a foreign country, either within or without this state, shall be required to sell such brands or kinds of alcoholic beverages to every licensed wholesale distributor who desires to purchase the same, on the same price basis and without discrimination, and shall further be required to sell such beverages only to those distributors licensed as wholesale distributors, and all laws passed by the Legislature under the authority of the Article shall be consistent with this provision.

### INITIATIVE PETITION NO. 314

"SECTION 3: ENACTMENT OF LAWS BY THE LEGISLATURE—SALES TO LICENSED WHOLESALE DISTRIBUTORS AND RETAILERS

The Legislature shall enact laws providing for the strict regulation, control, licensing and taxation of the manufacture, sale, distribution, possession and transportation of alcoholic beverage, consistent with the provisions of this Article. Provided, that any manufacturer, or subsidiary of any manufacturer who markets his product solely through a subsidiary or subsidiaries, a distiller, rectifier, bottler, winemaker, brewer or importer of alcoholic beverage, except a brewer or importer of beer or cereal malt beverages, bottled or made in a foreign country, either within or without this state, shall be required to sell such brands or kinds of alcoholic beverages, except beer or cereal malt beverages, to every licensed wholesale distributor who desires to purchase the same, on the same price basis and without discrimination. All persons referenced above shall sell such alcoholic beverages only to licensed wholesale distributors and in the case of brewers or importers of beer or cereal malt beverages only to licensed wholesale distributors of beer or cereal malt beverages. There are hereby created, for the retail sale of a alcoholic beverages, retail package store and retail on-premise consumption outlet licenses as specifically set forth in Section 4 of this Article. Any brewer of beer or cereal malt beverages shall have the right to enter into territorial or marketing arrangements with any licensed wholesale distributor of such beverages, upon such terms and conditions deemed suitable or desirable by the parties thereto, to facilitate the marketing of such product to all licensed retail on-premise consumption outlets and retail package stores in their marketing area. Licensed wholesale distributors of alcoholic beverages shall sell their alcoholic beverages only to licensed retail package stores, except wholesale distributors of beer or cereal malt beverages shall be authorized to sell to all or any licensed retail on-premise consumption outlet and/or retail package store in their marketing area. All laws passed by the Legislature, under the authority of the Article, shall be consistent with this provision."

## § 4. Prohibition of open saloon—Retail sales by package stores—Restrictions.

—The open saloon, for the sale of alcoholic beverage as commonly known prior to the adoption of the Eighteenth Article of Amendment to the Constitution of the United States of America, is hereby prohibited.

The words "open saloon" shall mean:

Any place, public or private, wherein alcoholic beverage is sold or offered for sale, by the drink; or, sold, offered for sale, or kept for sale, for consumption on the premises.

Retail sales of alcoholic beverage shall be limited to the original sealed package, by privately owned and operated package stores, in cities and towns having a population in excess of two hundred. No goods, wares or merchandise shall be sold and no services shall be rendered on the same premises on which alcoholic beverages are sold. Premises are herein defined to be the entire space in which alcoholic beverages are sold or displayed and said premises must be separated from any premises on which any other goods, wares or merchandise are sold or services rendered by walls which may only be broken by a passageway to which the public is not admitted. Not more than one retail license shall be issued to any person or general or limited partnership.

## § 5. Prohibition of sales to certain persons—Limitation on advertising—Penalties.

—It shall be unlawful for any licensee to sell or furnish any alcoholic beverage to:

A person under twenty-one (21) years of age; or

A person who has been adjudged insane or mentally deficient; or

A person who is intoxicated.

Sales, gifts or deliveries to persons under twenty-one (21) years of age shall be deemed a felony; and any license issued pursuant to any law, in compliance with this Amendment, shall be revoked, upon conviction for such sale, gift or delivery.

It shall be unlawful for any person, firm or corporation to advertise the sale of alcoholic beverage within the State of Oklahoma, except one sign at the retail

---

"SECTION 4: RETAIL SALE OF ALCOHOLIC BEVERAGES

Alcoholic beverages may be lawfully sold at retail only in the following manner:

(a) In the original sealed package for consumption off the licensed premises, by privately owned and operated licensed retail package stores, in cities and towns having a population in excess of two hundred; provided, it shall be lawful for a retail package store licensee to sell to a licensed retail on-premise consumption outlet. No goods, wares or merchandise shall be sold and no services shall be rendered on the same premises on which alcoholic beverages are sold or displayed and such premises must be separated from any premises on which any other goods, wares or merchandise are sold or services rendered by walls which may only be broken by a passageway to which the public is not admitted; provided, however, this provision shall not apply to retail on-premise consumption outlet licensees. Not more than one retail package store license shall be issued to any person or general or limited partnership.

(b) By the individual drink for consumption on the licensed premises, by privately owned and operated licensed retail on-premise consumption outlets. Physical separation of service areas within any restaurant, resort, lodge, hotel, motel, convention center, or other like type facility shall not require multiple licenses, so long as said service areas are under the ownership or control of a single retail on-premise consumption outlet licensee. Nothing herein contained shall prohibit or restrict a licensed retail on-premise consumption outlet from giving or serving alcoholic beverages by the individual drink without charge. Individuals, corporations or general or limited partnerships shall be eligible to be licensed as retail on-premise consumption outlets and no restrictions shall be placed on the number of licenses which may be issued to any licensee. Said license shall be subject to renewal annually, one (1) year from the date of issuance, or, if said renewal date falls on a Saturday, Sunday or legal holiday, the next regular business day thereafter.

The annual license fee for retail on-premise consumption outlets shall be One Thousand Dollars ($1,000.00). Notwithstanding the provisions contained in Section 7 of this Article, Forty percent (40%) of the total license fees collected from the licensing of retail on-premise consumption outlets shall be apportioned to The Oklahoma Department of Mental Health and earmarked for rehabilitation and treatment programs."

"SECTION 5: PROHIBITION OF SALES TO CERTAIN PERSONS—LIMITATIONS ON ADVERTISING AND PENALTIES.

It shall be unlawful for any licensee to knowingly sell or furnish any alcoholic beverage to:

(a) Any person under twenty-one (21) years of age;
(b) A person who has been adjudged insane or mentally deficient; or,
(c) A person who is intoxicated.

Knowingly selling or furnishing any alcoholic beverage to persons above designated shall be deemed a misdemeanor and any license issued pursuant to the provisions of this act may be revoked upon conviction for such sale in violation of this Section after a hearing before the Alcoholic Beverage Control Board and for good cause shown.

The selling of alcoholic beverages without a license shall be deemed a felony.

Any person under the age of twenty-one (21) years who misrepresents his age, for the purpose of obtaining the purchase of any alcoholic beverage, shall be guilty of a misdemeanor.

It shall be unlawful for any licensed retail package store to advertise the sale of alcoholic beverages within the State of

outlet bearing the words "Retail Alcoholic Liquor Store."

Sales to insane, mentally deficient, or intoxicated persons shall be deemed a felony.

Any person under the age of twenty-one (21) years who misrepresents his age, for the purpose of obtaining the purchase of any alcoholic beverage, shall be guilty of a misdemeanor.

Oklahoma, except by one sign at the licensed premises bearing the words, "RETAIL ALCOHOLIC LIQUOR STORE"; provided, brand name advertising shall be permitted within the licensed premises of a retail package store. All other licensees and persons authorized by law to sell alcoholic beverages in the State of Oklahoma shall be permitted to advertise, including, but not limited to, advertising brand names."

**§ 6. Prohibition of sales on certain days—Penalties.**—It shall be unlawful for any person to sell, at retail, any alcoholic beverage:

On the first day of the week, commonly called Sunday;

On the day of any National, State, County or City Election, including Primary elections, during the hours the polls are open; and

On Decoration or Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

Any licensee or person violating the provisions of this Section shall be deemed guilty of a misdemeanor and any license issued pursuant to the provisions of this act shall be revoked upon conviction for such sale in violation of this section.

"SECTION 6: PROHIBITION OF RETAIL SALES ON CERTAIN DAYS—PENALTIES

It shall be unlawful for any person, except as hereinafter set forth, to sell, at retail, any alcoholic beverage:

On the first day of the week, commonly called Sunday;

On the day of any National, State, County, or City Election, including Primary elections, during the hours the polls are open; and,

On Decoration or Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

The prohibitions in this Section, as set forth above, shall not apply to licensed retail on-premise consumption outlets, except with respect to the prohibition relating to the sale of alcoholic beverages while the polls are open on any election day. Provided further, a licensed retail on-premise consumption outlet shall be prohibited from selling any alcoholic beverage between the hours of Two o'clock (2:00) A.M. and Ten o'clock (10:00) A.M. of any calendar day.

Any licensee or person violating the provisions of this Section shall be deemed guilty of a misdemeanor, and any license issued pursuant to the provisions of this act may be revoked upon conviction for such sale in violation of this Section after a hearing before the Alcoholic Beverage Control Board and for good cause shown."

**§ 7. Taxation and licensing—Distribution of funds.**—The retail sale of intoxicating liquors shall be subject to the sales tax statutes enacted by the Legislature and in addition thereto the Legislature may levy taxes upon the manufacture, possession, and/or sale of intoxicating liquors, the proceeds of which, except sales tax, shall be distributed as follows:

(a) The Oklahoma Tax Commission shall collect and distribute the taxes collected under the terms of this Article and shall distribute ninety-seven percent (97%) of such taxes as are levied as follows:

(1) One-third (⅓) shall be allocated to the counties of the State of Oklahoma on the basis of area and population (giving equal weight to area and population) wherein the sale of intoxicating liquors is lawful and all of said funds shall be appropriated by the Board of County Commissioners in each county to all incorporated cities and towns in said county

on the basis of population within each city and town on a per capita basis based on the last preceding Federal Decennial Census.

(2) Two-thirds (⅔) shall be credited to the General Revenue Fund of the State of Oklahoma.

(b) The remaining three percent (3%) of such taxes collected under the provisions of this Act shall be paid to the State Treasurer and placed to the credit of the Oklahoma Tax Commission Fund, to be paid out of said fund pursuant to appropriations made by the State Legislature.

(c) All State license fees shall be collected by the Oklahoma Alcoholic Beverage Control Board and deposited in the State Treasury and after the expenses of the Board, as approved by the Legislature, have been deducted, the balance shall be credited to the General Fund.

### § 10. Restrictions on issuance of licenses.

—No retail or wholesale distributor's license shall be issued to:

(a) A corporation, business trust or secret partnership.

(b) A person or partnership unless such person or all of the copartners including limited partners shall have been residents of the State of Oklahoma for at least ten (10) years immediately preceding the date of application for such license.

(c) A person or a general or limited partnership containing a partner who has been convicted of a violation of a prohibitory law relating to the sale, manufacture, or the transportation of alcoholic beverages which constituted a felony or misdemeanor.

(d) A person or a general or limited partnership containing a partner who has been convicted of a felony or who has held a Federal Liquor Stamp while a resident of the State of Oklahoma prior to the adoption of this act, except those persons who have held said stamp on a military reservation or installation.

"SECTION 10: RESTRICTIONS ON ISSUANCE OF LICENSES

(a) No retail package store or wholesale distributor's license shall be issued to:

(1) A corporation, business trust or secret partnership.

(2) A person or partnership unless such person or all of the co-partners including limited partners shall have been residents of the State of Oklahoma for at least ten (10) years immediately preceding the date of application for such license.

(3) A person or a general or limited partnership containing a partner who has been convicted of a violation of a prohibitory law relating to the sale, manufacture or the transportation of alcoholic beverages which constituted a felony or misdemeanor.

(4) A person or a general or limited partnership containing a partner who has been convicted of a felony.

(b) No retail on-premise consumption outlet license shall be issued to:

(1) An individual or partnership unless such individual or at least one of the co-partners including limited partners shall be a resident of the State of Oklahoma on the date of application for such license.

(2) A corporation unless such corporation is properly incorporated or domesticated to do business in the State of Oklahoma and in good standing on the date of application for such license.

(3) A person or a general or limited partnership containing a partner who has been convicted of a felony.

(4) An individual, general or limited partnership or corporation unless such individual or all of the general partners or all of the officers are at least twenty-one (21) years of age."

**OPALA, Justice, concurring:**

The court holds that the initiative measure under review cannot be given clearance for submission to a vote as a proposed constitutional amendment. While I accede to the court's pronouncement and join in its judgment, I offer (a) some of my own thoughts on the test properly to be used for assaying a measure's compliance with the single-subject requirement of Art. 24 § 1, Okl.Con., and express (b) my special appeal for a more vigilant judicial protection of a reasonable time span, between clearance and submission of a measure, in order to facilitate full, public and meaningful pre-election ventilation of the propositions to be voted upon.

## I.

### THE SINGLE–SUBJECT TEST UNDER ART. 24 § 1, OKL.CON.

Viewed liberally—we are urged—each of the petition's separate propositions deals with *but one general subject*—the regulation or control of liquor. This subject—we are told—must be recognized as *unitary* because all of the provisions which relate to it are presently contained in the same article of our fundamental law. Art. 27, Okl. Con. At first blush this argument appears to have merit. On a more profound analysis, it becomes devoid of any semblance of validity and must meet with rejection.

A single-subject measure, within the meaning of Art. 24 § 1, Okl.Con., is one whose componential ingredients, no matter how *numerous*, are so *functionally interrelated* as to all form parts of an *integrated whole*. The widely accepted test for gauging duplicity or multiplicity of subjects is whether the changes proposed are all germane to a *singular common subject and purpose or are essentially unrelated one to another.*[1]

Measured by these criteria of validity, the proposition under consideration cannot pass muster. Its components have no *direct*, essential relation to *each other*. None of them is *necessary* to, or *concerned* with, any of the others. The individual propositions concatenated in the measure for the proposed constitutional amendment lack a *common nexus* that imparts internal cohesion and binds them by a *singular objective and purpose.*

## II.

### CONSTITUTIONALLY–MANDATED PROTECTION OF A REASONABLE TIME SPAN, BETWEEN JUDICIAL CLEARANCE OF A MEASURE AND ITS SUBMISSION, TO ALLOW FOR MEANINGFUL PRE–ELECTION PUBLIC VENTILATION OF THE ISSUES TO BE VOTED UPON

Another issue implicit in the judicial process that unfolded itself before us has given me pause for concern. This petition's post-circulation filing was effected *August 6th.* The protest was timely lodged *August 28th.* The evidentiary proceedings before the referee could not begin until *September 11th.* The general election fell on *November 4th.* Customarily this court has allowed protestants ample time to complete their discovery by a statewide canvass of voters' registration records and by other investigation necessary for presentation of evidence on the challenge to the validity of signatures.[2] Had as much as a ninety-day discovery period been necessary in this case, the evidentiary hearings could not have begun until the end of November—too late for submission of the measure at the general election next succeeding the post-circulation filing. Even if the petition had been approved for submission by a final decision made at some point in time between September 11th and November 4th, I seriously doubt that the time span then left between

1. *Rupe v. Shaw*, Okl., 286 P.2d 1094, 1100 [1955]; *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549, 554 [1934], 94 A.L.R. 1502; *Keenan v. Price*, 68 Idaho 423, 195 P.2d 662, 681 [1948]; *Idaho Water Resources Board v. Kramer*, 97 Idaho 535, 548 P.2d 35, 52 [1976]; *Kahalekai v. Doi*, 590 P.2d 543, 552 [Hawaii 1979].

2. *In re Initiative Petition No. 272, State Question No. 409*, Okl., 388 P.2d 290, 292 [1964].

our clearance of the petition and its submission to a vote would have been adequate for a meaningful and informative public debate and discussion. The opportunity for full and public pre-election ventilation of the propositions to be voted upon has come to be regarded not only as a constitutionally-protected interest of the clashing advocacy forces but also as a political value of the public at large in the preservation of a free marketplace interchange of ideas. There can no longer be the slightest doubt about the notion that the advocates' interest in the debate and the political value of public discussion both stand shielded by the state and federal constitutions.[3]

This court has a constitutionally-mandated duty to uphold and safeguard free pre-election ventilation of political views. Art. 2 § 22, Okl.Con. Judicial clearance of an initiative or referendum measure for submission to a vote must never be allowed to take place so close to the election as to abridge the time span that is required for a full and meaningful public debate and discussion of the propositions to be voted upon.

LAVENDER, Chief Justice, concurring in part, dissenting in part:

I concur in that part of the majority opinion which holds that article 5, section 6 of the Oklahoma Constitution is applicable to Initiative Petition No. 314 and that the proof of the number of invalid signatures is so far not sufficient to invalidate the petition for that reason (lack of sufficient signatures). The petition had to have 194,353 signatures. The evidence shows it has 195,405 valid signatures. I would allow the contestants' application for additional time to review signatures. In the short period the contestants had (twenty-one days), they were able to check only twenty of the seventy volumes comprising Initiative Petition No. 314. Contestants' efforts resulted in the apparently successful challenge of 2,221 signatures. It is reasonable to believe that if contestants were allowed thirty additional days to check signatures they would be

able to turn up the additional 1,053 they would need to establish their contention that the petition contains insufficient signatures.

In requesting the contestants to complete their proof by the time the matter was submitted in oral argument it was anticipated that, if the court determined the matter was a resubmission and required the greater numbers of signatures because of article 5, section 6, the contestants' proof would be sufficient to resolve the matter before the ballot deadline. Subsequent events demonstrated that not enough time had been allowed the contestants for them to fairly develop and present their evidence.

Because the matter of sufficient signatures could not possibly be resolved in time to allow State Question 550 to be put on the November 4, 1980, ballot, I concurred in the court's order directing that the petition and the state question presented thereby not be placed on the November 4 ballot.

I agree also with the majority view regarding the treatment of the term "legal voter" as used in the Constitution.

I respectfully disagree with the court's holding that Initiative Petition 314, as it presents State Question 550, violates article 24, section 1 of the Constitution because it contains more than one "general subject matter."

In my view, the one general subject matter of Initiative Petition 314 is *the control of alcoholic beverages* and may include properly not only the question of on premises sales for consumption together with licensing, but whether certain restrictions regarding advertising should be adopted, and whether franchising agreements by brewers of strong beer should be allowed.

The restriction of article 24, section 1 as to the one general subject limitation, assuming it is applicable to the exercise of the people's right of the initiative (which may be contra to article 24, section 3), should never be strictly construed so as to inhibit the people in their right to initiate constitutional amendments.

---

3. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 [1978];

Art. 2, § 22, Okl.Con.; *Kahalekai v. Doi,* supra note 1 at 553.

The constitutional article involved, particularly section 3 thereof, casts some doubt as to whether the one general subject limitation of the second paragraph of article 24, section 1 is even applicable to measures to amend the Oklahoma Constitution when they are being offered by the people as separate from legislatively referred measures. Section 3 provides:

This article shall not impair the right of people to amend this Constitution by a vote upon an initiative petition therefor.

Article II, section 1 of the Oklahoma Constitution provides:

All political power is inherent in the people; and government is instituted for their protection, security and benefit, and to promote their general welfare; and they have the right to alter or reform it, provided, such change be not repugnant to the Constitution of the United States.

A review of our own cases as well as authorities from other jurisdictions which have constitutional provisions similar to our article 24, section 1 establishes that the more liberal interpretation represents the better supported view, and the view of the majority of the states which have considered the problem.

The first Oklahoma case involving the problem, *Rupe v. Shaw*, 286 P.2d 1094 (Okl. 1955), concerned a proposal to amend the Constitution referred to the voters by the Legislature. The "gist" of the referred proposal appears on page 1096 of the Reporter. It involved the following questions, all of which were submitted together: (1) amend three sections of article 10, (2) provide ad valorem taxes for public schools, (3) place certain restrictions thereon, (4) limit consideration thereof in state guaranteed school program, (5) authorize additional use of the levy heretofore made for erection of public buildings, (6) increasing the schools' debt limits for certain purposes, (7) removing limitations on certain contracts beyond current year, (8) adding two new sections to article 10 to provide additional funds for buildings for school districts, and (9) for buildings and capital improvements at certain state institutions.

Many of the above questions could easily have been submitted as separate propositions. Some of the questions undoubtedly would be popular with some segments of the voters and some not. This package of proposals was held to not be violative of article 24, section 1—the one general subject requirement.

Citing cases from other jurisdictions, this court said such limitations on the right of the people to vote amendments to the Constitution "are to receive a liberal, rather than a narrow or technical construction." The court found the various provisions sufficiently related as to constitute a single scheme and said "matters germane to the same general subject indicated in the amendment's title, or within the field of legislation suggested thereby, may be included therein."

After examining the various provisions, the court observed with regard to them, "they show that the general subject and purpose of the proposed constitutional amendment was to enable the State, as well as its school districts, to surmount previous limitations and inadequacies in their constitutional authority for raising funds." And, "the details provided for its accomplishment . . . may be regarded as incidents." By referring to *Dunlap v. Board of Co. Comm'rs*, 85 Okl. 295, 205 P. 1100 (1922) and similar cases, the court considered article 5, section 57 of the Oklahoma Constitution, which requires legislation to have one subject matter. The court in the *Dunlap* case held a statute related "primarily to only one general subject, namely, public roads" which act provided for the sale of land to secure federal aid and also empowered county commissioners to designate roads as state highways. The case of *In re Lee*, 64 Okl. 310, 168 P. 53 (1917), which dealt with the act which created the Supreme Court Commission—which contained a provision for a docket fee in lieu of previous cost deposit required by law—only related to one subject matter. Reference to other case law produced the quotation on page 1100 of 286 P.2d "to constitute duplicity of subject, an act must embrace two or more

dissimilar and discordant subjects, that by no fair intendment can be considered as having any legitimate connection with or relation to each other" and "it is enough that they are connected with and related to a single subject in popular signification."

In 1962, in rejecting a claim that an initiative petition was invalid because it contained more than one general subject matter, this court reaffirmed the position taken in *Rupe v. Shaw, supra,* "this provision of the Constitution is to receive a liberal rather than a narrow or technical construction. It is a cardinal rule that such a restrictive provision shall not be so construed as to hamper and unreasonably restrict legislation." *In re Initiative Petition No. 271,* 373 P.2d 1017, 1019 (Okl.1962).

Considering this court's tradition of viewing liberally the restrictions of article 5, section 57 of the Oklahoma Constitution, as it affects acts of the Legislature, *In re Lee, supra,* I cannot understand why the court today imposes a strict interpretation of article 24, section 1, Oklahoma Constitution, to the fundamental right of the people to amend the Constitution.

I reject as too strict the standard adopted by the 1934 Arizona case of *Kerby v. Luhrs,* 44 Ariz. 208, 36 P.2d 549, 94 A.L.R. 1502, and now being advanced as the standard by which Oklahoma initiative petitions shall be measured in the future. Specifically, referring to the text of that case, 36 P.2d at 554:

> [I]f any one of the propositions . . . is not such that the voter supporting it could reasonably be expected to support the principle of the others, (other propositions) then there are in reality two . . . amendments . . . within the constitutional prohibition.

And again in the same opinion it is said, applying the above "test,"

> [Here] there are at least three distinct propositions . . ., no two of which are *necessarily required* for a proper operation of the third. [Emphasis mine.]

Additionally, *Kerby v. Luhrs* involved a provision of the Arizona constitution which is much more restrictive of the right of the initiative than our article 24, section 1. The

Arizona constitutional provision applied to invalidate the petition in that case follows:

> Article 21, § 1: ". . . If more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately."

In fact, on 36 P.2d page 553 the Arizona court quotes an earlier case with approval:

> "[T]hey (the various proposals)· shall be submitted separately, . . . even though they may pertain to the same general object or purpose."

Compare our article 24, section 1 which provides in part:

> No proposal . . . shall embrace more than one general subject . . . .

Furthermore, the *Kerby* case is distinguishable on the facts of that case. There three sections of an article were being amended. One of the proposals had to do with tax on the copper mining industry; another provided how the tangible property of public utilities could be assessed for tax purposes, and yet a third proposal created a constitutional Tax Commission for Arizona. While of course all of these proposals related in a remote way to the subject of taxation, they were obviously not germane to a single general purpose or subject, but apparently they would have been invalidated even if they had been because of the strict "test" of the Arizona court heretofore referred to in this opinion at the beginning of the discussion of this case.

Turning to cases from other jurisdictions, research shows that the liberal view of state constitutional provisions similar to our article 24, section 1 has been adopted in other states. The following quotations are from *State v. Helmer,* 169 Minn. 221, 211 N.W. 3 (1926):

> This provision is always liberally construed to avoid unduly hampering legislative action; and doubts concerning the sufficiency of the title of an act are resolved in favor of its sufficiency.

211 N.W. at 3–4. And,

> "It matters not that the act embraces technically more than one subject, one of

which only is expressed in the title, ... so that they are not foreign and extraneous to each other, but 'blend' together in a common purpose evidently sought to be accomplished by the law.... "

"The term 'subject,' as used in the Constitution is to be given a broad and extended meaning, so as to allow the Legislature full scope to include in one act all matters having a logical or natural connection.... "

211 N.W. at 4. And,

[A]ll matters treated of should fall under some one general idea, be so connected or related to each other, either logically or in popular understanding, as to be part of, or germane to one general subject.

See also, *C. Thomas Stores Sales System v. Spaeth*, 207 N.W. 9 (Minn.1941); *Blanton v. Northern Pac. Ry. Co.*, 215 Minn. 442, 10 N.W.2d 382 (1943); and *Fugina v. Donovan*, 259 Minn. 35, 104 N.W.2d 911 (1960). In the *Fugina* case it is pointed out that such a constitutional provision requires the separate submission of proposed amendments having different objects and distinct purposes not dependent upon or connected with each other, and simply because the various provisions could be submitted separately is no reason to require them to be "if they are rationally related to a single purpose, plan, or subject."

In the 1977 Minnesota case of *Wass v. Anderson*, 312 Minn. 394, 252 N.W.2d 131 the term "logrolling" was defined. The inclusion of "different measures, dissimilar in character, ... united together with the sole view, by this means, of compelling the requisite support to secure their passage is a practice known as 'logrolling.' " The fact that *some one or more of the provisions* included as a part of the same general subject matter had been unsuccessfully introduced in a previous session of the Legislature was not logrolling. The combining of different and disconnected subjects is what is prohibited.

See also *New Jersey Ass'n on Correction v. Lan*, 80 N.J. 799, 403 A.2d 437 (1979); *State v. Steinwedel*, 180 N.E. 865 (Ind. 1932); and *In the Matter of Estate of Wisely*, 402 N.E.2d 14 (Ind.1980).

As I read *Kerby*, it provides that if the voter would not reasonably be expected to vote the same way for both propositions, then there are two separate propositions and must be submitted separately. The *Kerby* case goes even further. If one (or more) propositions are not *necessary* for the proper operation of the other, then there are two (or more) propositions involved and they must be submitted separately, regardless of whether the "separate" propositions are germane to an overall general integrated reform measure.

I was impressed by the views of the California Supreme Court in the recently decided case of *Amador Valley Joint Union High School District v. State Board of Equalization et al.*, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978), wherein the California court considered the state's constitutional provision which provided: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect. Art. II, § 8, subd. (d))":

Petitioners assert that each of the four separate elements of article XIII A might not have been approved had each element appeared separately on the ballot. They speculate that various classes of voters may have favored some, but not all, of these elements; petitioners would require a showing that *each* of the several provisions of an initiative measure is capable of gaining approval by the electorate, independent of the other provisions. We are unable to accept such a contention, concluding that petitioners' proposed single-subject test is far too strict, and lacks support in authorities. Aside from the obvious difficulty of ever establishing satisfactorily such "independent voter approval," this standard would defeat many legitimate enactments containing isolated, arguably "unpopular," provisions reasonably deemed necessary to the integrated functioning of the enactment as a whole. We avoid an overly strict judicial application of the single-subject requirement, for to do so could well frustrate legitimate efforts by the people to accomplish integrated reform measures.

Applying the tests as above outlined to Initiative Petition 314, S.Q. 550, I would hold that the various provisions referred to therein pertaining to the importation, transportation, distribution, advertising, and sale in both package stores and on-premises location of alcoholic beverages and the licensing therefor, the collection and distribution of the revenue from issuing the licenses, the hours of operation and criminal penalties for violations all are reasonably germane to the one general subject of Petition No. 314, State Question 550 which is the control of alcoholic beverages within the State of Oklahoma.

The fact that these provisions were separately supported by different groups or that the inclusion of one or more of them with the provision having for its purpose the allowance of the sale of liquor for consumption on the seller's premises may result in the adoption of franchising or more liberal advertising rules is, after all, immaterial. Also the petition should not be invalidated simply because some of the provisions would not perhaps be approved if submitted separately. By fair intendment it can be said these provisions have a legitimate connection with each other and with the general subject of the petition, I would therefore uphold the right of the people of Oklahoma to have such issues determined by a vote thereon assuming, of course, the petition has the requisite valid signatures thereon.

DOOLIN, Justice, dissenting:

The immediate cause of this action is the strongly contested and perhaps quixotic liquor by the drink issue. Of more importance to the people of this state, as it approaches the 21st Century, is the basic, fundamental and far reaching result effected by the majority opinion. The opinion acts to limit a guaranteed and reserved power in the people: the right to initiate legislation.

I agree with the majority opinion that "[c]ourts do not concern themselves with the expediency or wisdom of law, but only with their (sic) legality."[1] Yet, the majority opinion would usurp the judgmental decision of that proposed constitutional amendment rather than allow that judgment to be made by the people.

The right of amendment by initiative petition must not be impaired by any provisions of Art. 24.[2] Art. 5, § 1 reserves to the people the power to amend *their* state constitution. The ultimate power reserved cannot be diminished by application of any part of Art. 24. Art. 5, and not Art. 24, controls the subject matter of this initiative petition. Section 3, Art. 24 prohibits the impairment called for by the majority opinion and was not amended or changed directly or by implication with the amendment of § 1. I agree with the spirit and language of *Atwater v. Hassett, supra.*[3] Section 1, Art. 24 should be construed as a limitation on the legislative referendum process of amending the constitution, and not a limitation on the initiative process of the people. Art. 5, § 1, as to the power reserved to the people, is not subservient to Art. 24. There can be no limitation on the people as to one subject matter in Art. 5, § 1. This is not required of initiated measures, including constitutional amendments.[4]

1. *Associated Industries, supra,* 55 P.2d 79, 81.

2. Art. 24 § 3 provides:
   This article shall not impair the right of the people to amend this Constitution by a vote upon an initiative petition therefor.
   Art. II, § 1 of the Oklahoma Constitution provides:
   All political power is inherent in the people; and government is instituted for their protection, security and benefit, and to promote their general welfare; and they have the right to alter or reform it . . .

3. 111 P. p. 804:

"This amendment not having been submitted by virtue of section 1, art. 24, supra, the same has no application to this case. Said amendment was submitted on an initiative petition."

4. *In re Initiative Petition Number 259, etc.,* Okl., 316 P.2d 139, 145 (1957). Subject matter was a proposed constitutional amendment by initiative petition relating to 3.2 beer.
   "Art. V, § 57, Okl.Const., provides that every act of the *Legislature* shall embrace but one subject, which shall be clearly expressed in its title. This is not required of initiated measures."

Assuming the majority opinion correct, I would likewise differ finding no violation in State Question No. 550 of more than one general subject matter.[5] Control of alcoholic beverage is the general subject of this initiative petition. All the other provisions are supplemental to that general purpose. The majority opinion draws a fine distinction with such phrases and words as "reasonably germane", "incidental", "supplemental", "administrative detail", "rational relationship" and "interlocking package". I have no trouble in applying these "handles" to the amendments provided by the initiative petition under the general subject of alcoholic beverage control. These abstract terms fill the understanding of "one subject matter" with uncertainty. Certainty is not determined by these terms, rather uncertainty is bred.

I further differ from the position of my colleagues inasmuch as Art. 24, § 1, as amended in 1952 by a vote of the people, states:

"... provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition."

"Logrolling" becomes a major concern of the majority opinion. I balance that with the peoples' innate understanding as to what is involved. If there is a "bitter" with the "sweet" in this initiated amendment then the individual needs to be able to decide if the "sweet" overcomes the "bitter", or if the "bitter" is too acid to digest.

The majority opinion determines the subject matter of this initiative petition unconstitutional for it contains more than one subject matter. There should be no court created limitation on initiative amendment process by the people. There is only one general subject matter in the present amendments, that of control of alcoholic beverage.

Although admittedly not factually identical and nor absolutely similar in statutory or constitutional directives, I find the rationale of the following cases and jurisdictions persuasive in upholding the conclusion of *Rupe v. Shaw*, 286 P.2d 1094, 1097 (1954), that "... such constitutional provisions are to receive a *liberal, rather than a narrow or technical construction*, which would overthrow proper legislation ..." *(Emphasis added)*. See In Re Initiative Petition No. 271, State Question 408, *373 P.2d 1017 (Okl. 1962), cert. denied 371 U.S. 949, 83 S.Ct. 502, 9 L.Ed.2d 498;* In re Referendum Petition No. 18, State Question No. 437, *417 P.2d 295 (Okl.1966);* Bernzen v. City of Boulder, *186 Colo. 81, 525 P.2d 416 (1974);* Boucher v. Engstrom, *528 P.2d 456 (Alaska 1974);* Colorado Project—Common Cause v. Anderson, *178 Colo. 1, 495 P.2d 220 (1972);* State ex rel. Morris v. Marsh, *183 Neb. 521, 162 N.W.2d 262 (1968).*

The sole part of the majority opinion with which I agree is its definition of "legal voters" as that calculated from the number of votes cast in the last general election for the state office receiving the highest number of votes.

HARGRAVE, Justice, dissenting:

I respectfully dissent from the views expressed in the majority opinion. The single subject limitation of § 1, Article 24 has indeed been the subject of much litigation. The majority cites *Rupe v. Shaw*, 286 P.2d 1094, recognizing in that action that the single subject limitation must receive a liberal, rather than a narrow or technical construction. Our review of the single subject limitation there resolved that provisions governing projects so related as to constitute a single scheme, and matters germane to the same general subject, or within the field of legislation suggested thereby, may be included. We additionally noted in

---

5. *In re Initiative Petition No. 271*, Okl., 373 P.2d 1017 (1962) subject matter was a proposed Constitutional Amendment by initiative petition relating to reapportionment:

"The initiative petition embraces one general subject, the reapportionment of the Legislature, as provided by the Constitution of the State of Oklahoma. All the other provisions, such as setting up a committee for its enforcement, *are supplemental to the general purpose.*" (Italics supplied).

*Rupe, supra,* details provided for the accomplishment of this general purpose may be regarded as incidents of the general design although they subserve other purposes than the main purpose.

*Rupe* is directly on point here, and its strictures require me to conclude the single subject limitation is satisfied in the initiative petition before us now. The general purpose of the regulation of trade in alcoholic beverages is accomplished through various details which all subserve the general purpose. I would therefore submit the proposal to the voters, upon determination of a proper number of valid signators.